

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-15-193

| | | |
|---|---|---|
| HECTOR HORTELANO | | **Opinion Delivered:** February 22, 2017 |
| | APPELLANT | |
| | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TWELFTH DIVISION |
| V. | | [NO. 60DR-10-3555] |
| | | |
| LAURA HORTELANO | | |
| | APPELLEE | HONORABLE ALICE S. GRAY, JUDGE |
| | | |
| | | AFFIRMED |

## RAYMOND R. ABRAMSON, Judge

Hector Hortelano appeals the divorce decree from his former wife, Laura Hortelano, issued by the Pulaski County Circuit Court. On appeal, Hector argues that the circuit court erred in awarding joint legal custody to the parties with Laura being the primary custodial parent. We affirm.

On July 29, 2010, Hector filed a divorce complaint against Laura. He asserted that both he and Laura were fit and proper parents and asked the court to award joint custody of their children, I.H. and A.H., with him being the primary custodial parent. Laura filed a counterclaim for divorce. She also asked for joint custody; however, she requested that she be the primary custodial parent. On September 22, 2010, the court entered an agreed temporary order granting joint custody with Hector being the primary custodial parent and Laura having visitation every other weekend and every Wednesday after school.

On March 25, 2011, following a hearing, the court entered a temporary order stating that "the parties shall have joint custody of the minor children with neither party designated as the primary custodial parent." The court ordered the same visitation schedule as contained in the September 2010 agreed order. The court further noted that "neither party shall have members of the opposite sex overnight with them when they have children with them unless they are related or married to that person."

On August 19 and August 21, 2014, the court held a final divorce hearing. At the hearing, Hector testified that Laura left him and the children on July 26, 2010, and that he then filed for a divorce. He denied kicking Laura out of their home, and when asked whether he changed the door lock in the days before Laura left, he stated that he changed the lock because their daughter had broken it. He noted that Laura had an affair with his brother and that angered him, but he denied kicking her out as result of the affair. He explained that since Laura left, he had been the primary caregiver of the children and had transported them to and from school every day. He also stated that he had paid for their tuition to private school, school supplies, clothes, and karate lessons. When asked whether I.H., their then eleven-year-old daughter, slept in his bed at night, Hector stated that she only slept with him when she had nightmares or during bad weather.

Laura testified that she began having a sexual relationship with Hector when she was thirteen years old. She stated that when they met, Hector told her that he was seventeen years old, but she later discovered he was twenty-seven. She explained that when she was thirteen, she and Hector traveled to Mexico, and they later married there when she was fourteen. She testified that he had limited her contact with her family while they were in

Mexico. They returned to the United States in 2005 and remarried for Hector's immigration status.

Laura testified that during the marriage, she was the primary caregiver for the children and that Hector worked long hours. She further testified that she and Hector fought frequently over his brother's living with them. Laura did not like his brother's living with them because they had a two-bedroom trailer, and the children had to sleep with her and Hector. She stated that Hector had kicked her out of the house several times as a result of the fights. She admitted that she had an affair with Hector's brother and stated that she told Hector about it in May 2010. Hector then tried to kick her out, but she refused to leave the children. She stated that in July 2010, he changed the locks on the trailer and denied her entry. Laura then lived in her car before moving in with a male coworker. She denied having a romantic relationship with the coworker but stated that he had raped her, though she never filed charges.[1] She testified that Hector had control over her financial and personal records; so she had nothing when he kicked her out. She stated that she tried to give Hector money to help with the children's needs but he refused it.

As to her current living situation, Laura testified that she lives with her boyfriend, Addias Lopez, in a two-bedroom trailer in Hot Springs and that they have two children together. She explained that they have lived together since 2011 and that they plan to marry when her divorce from Hector is final. She testified that Adidas has no criminal history but he does not have a legal immigration status. She noted that she is not employed but is enrolled as a full-time student at National Park Community College. She hopes to become

---

[1] At a previous hearing, Laura denied that the coworker had raped her.

a registered nurse. Laura testified that she called child-protective services about I.H. sleeping in Hector's bed every night, but the investigation was closed as unsubstantiated.

Laura's mother, Maria Alvarez, testified that Hector and Laura began having a sexual relationship when Laura was thirteen years old and Hector was twenty-seven years old and that she disapproved of the relationship. She further testified that Hector kidnapped Laura and took her to Mexico. She explained that she contacted the police, but the police told her they could do nothing since Laura had left the county. She eventually located a phone number for Hector and Laura and made contact with them, but Laura refused to return to the United States until her mother stopped the kidnapping investigation and gave her permission to marry Hector. She stated that either she or her husband had given them permission to marry.

Alvarez testified that when Hector and Laura returned to the United States, Laura acted as the primary caregiver for the children and that Hector limited her time away from their house as well as her communication with others. She explained that Hector and Laura had arguments about Hector's brother living with them and that Hector had kicked Laura out of the house on several occasions. As to Laura leaving Hector and the children in July 2010, Alvarez testified that Hector had kicked Laura out of the house. She also testified that I.H. continues to sleep in Hector's bed and that concerned her.

Hector and Laura's daughter, I.H., then testified that she sleeps with her father and brother every night. When asked with whom she wanted to live with, I.H. stated that she did not know.

At the conclusion of the hearing, the attorney ad litem recommended that the court award joint custody with Hector being the primary custodial parent. The court then orally noted,

> One of the concerns I have is the comment about the mother moving on with her life, because we have had the case going on for four years in this Court, and I am not sure what any would have expected for her to do, and you may say she is gone and had two children by someone else. But as judge, I personally think what he did far outweighs what she has done. A fourteen-year-old or thirteen-year-old, out of the country with[out] the parents' consent, and I have to look at character. The kind of person who would do that, and I am having some problems with that as it relates to his character overall. To take a child away from [her] parents without their consent is basically kidnapping and to take [her] out of the country, and while, you may not think it is right, I have seen a lot of people who have children out of wedlock these days, and obviously she had two, but I think the fact that taking an underage child as young as thirteen, and having sex with them and then moving from the country, not just having sex with them, far outweighs her having two children.

The court took the custody matter under advisement. Thereafter, the court held a teleconference stating that it planned to grant joint custody with Laura having primary physical custody. The court stated that it "considered all of the evidence" and that its ruling was "not just based on the sleeping arrangement."

On November 13, 2014, the court entered a divorce decree. The court found it was in the best interest of the children for the parties to have joint custody with Laura being the primary custodial parent. The court awarded Hector visitation every other weekend as well as visitation at least twice during the week with Wednesday overnight visits. Hector timely appealed the divorce decree to this court. On appeal, he argues that the court erred in awarding Laura custody of the children.

This court reviews child-custody cases de novo and will not reverse a circuit court's findings unless they are clearly erroneous. *Gibson v. Gibson*, 2010 Ark. App. 741. A finding

is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Id.* Because the question of whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Id.* In fact, there are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as those involving minor children. *Id.*

The primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Fox v. Fox*, 2015 Ark. App. 367, 465 S.W.3d 18. Although joint custody has been disfavored in Arkansas in the past, Act 1156 of 2013 amended Arkansas Code Annotated section 9-13-101 to state that an award of joint custody is now favored in divorce proceedings. *Id.* When in the child's best interest, custody should be awarded in such a way as to assure the frequent and continuing contact of the child with both parents. Ark. Code Ann. § 9-13-101(b)(1)(A)(i) (Repl. 2015). Other factors that may be considered in determining what is in the best interest of the child include the psychological relationship between the parents and the child, the need for stability and continuity in the child's relationship with parents and siblings, the past conduct of the parents toward the child, and the reasonable preference of the child. *Rector v. Rector*, 58 Ark. App. 132, 947 S.W.2d 389 (1997).[2]

---

[2] Throughout his brief, Hector references the custody award in the divorce decree as a modification of custody from the court's September 2010 and March 2011 orders and cites the legal standard for a modification of an initial custody determination. Hector is mistaken. The prior orders were temporary orders, not initial custody determinations. Specifically, the September 2010 order states that the parties "agreed on a temporary basis,"

SLIP OPINION

Hector argues that the court erred in finding it was in the best interest of the children to award joint custody with Laura having primary physical custody because of Laura's unstable lifestyle and her promiscuous conduct with men. He points out that at the time of the hearing, Laura did not have a job and lived in a two-bedroom trailer with her boyfriend and their two children. He further points out that Laura cohabitated with her boyfriend in violation of the court's previous orders and that she had lived with another man prior to that. He claims that the court failed to consider these circumstances and disregarded the fact that Laura did not call her boyfriend as a witness.[3]

We hold that the circuit court did not clearly err in awarding the parties joint custody with Laura being the primary custodial parent. Despite Laura's lifestyle and romantic relationships, the primary consideration in child-custody cases is the welfare and best interest of the children. *See Moix v. Moix*, 2013 Ark. 478, 430 S.W.3d 680 (stating that public-policy arguments against romantic cohabitation may not override the primary consideration of what is in the best interest of the children); *Carver v. May*, 81 Ark. App. 292, 101 S.W.3d 256 (2003) (stating that the fact that a parent has violated court orders is a factor to be taken

---

and the March 2011 order is titled "Temporary Order." Further, in the teleconference, the court specifically stated, "I don't consider the temporary order[s] to be . . . final order[s]." Accordingly, we review this appeal as an appeal of an initial custody determination, and Hector's arguments concerning Laura's burden to prove changed circumstances are irrelevant.

[3] In a point heading, Hector also asserts that Laura's "cohabitation and recurrent promiscuous activities demonstrate that she was not a fit parent." However, in the text following that point heading, Hector does not assert that Laura is an unfit parent; he discusses her cohabitation with her boyfriend and how it relates to the best interest of the children. Our courts do not consider an argument when the appellant presents no citation to authority or convincing argument in its support. *Baker v. State*, 2016 Ark. App. 468. We also note that in Hector's divorce complaint, he alleged that both he and Laura were fit and proper parents.

into consideration, but it is not so conclusive as to require the court to act contrary to the best interest of the child). Here, the record showed that Laura had been the primary caregiver before the parties' separation and that she left because Hector had kicked her out of their home. Further, the record showed that Hector and Laura began having sex when Laura was only thirteen years old and that Hector kidnapped her to Mexico, which the court found reflected poorly on his character.

As to Hector's assertion that the circuit court failed to consider the facts about Laura's lifestyle and the absence of her boyfriend from the hearing, the circuit court was not required to make specific findings on every allegation that each party made against the other, and if Hector wanted such findings, he could have asked for them pursuant to Arkansas Rule of Civil Procedure 52. *See Black v. Black*, 2015 Ark. App. 153, 456 S.W.3d 773. Even so, the court's oral statements at the conclusion of the divorce hearing show that the court weighed the circumstances of both Hector's and Laura's home environments, and in the teleconference following the hearing, the court stated that it had considered all the evidence.

Hector also asserts that the circuit court improperly discredited his testimony based on his language barrier. However, Hector fails to show that the court rested its decision on a finding that he was not credible. Again, the court did not make specific findings of fact, and the court stated that it had considered all the evidence when making its decision.[4]

---

[4] Hector cites *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 288 (2002), for his proposition that a court cannot discredit a party's testimony when inconsistencies in the testimony could be attributed to a language barrier. However, in that case, the court cited the appellant's inconsistent testimony as a factor warranting change of custody.

Accordingly, we are not left with a definite and firm conviction that a mistake has been made, and we affirm the custody award.

Affirmed.

VIRDEN and GLADWIN, JJ., agree.

*Hale & Young, P.L.L.C.*, by: *Milas H. Hale III*; and *Robert S. Tschiemer*, for appellant.

*Morris W. Thompson Law Firm, P.A.*, by: *Morris Thompson*; and *Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellee.