ROBERT J. GLADWIN, Judge
Shannon L. Williams appeals the Carroll County Circuit Court's divorce decree, which awarded joint custody of their three children to her and appellee Doby L. Williams. She argues that (1) the trial court erred in considering she might move the boys to Ohio as a factor in the custody decision; (2) the trial court erred by considering her move to Harrison, Arkansas, as a factor in the custody decision; and (3) the trial court's decision to award joint custody was clearly against the preponderance of the evidence. We affirm.
I. Statement of Facts and Procedural History
The Williamses were married on November 8, 1997, and Shannon filed for divorce from Doby on June 10, 2015, alleging a separation date of May 28, 2015. They have three boys-DW (born 09/23/2004); RW (born 07/12/2007); and JW (born 07/5/2010). JW was born with cerebral palsy, and he requires specialized care. Shannon is a registered nurse, having obtained her degree during the last years of her marriage and during the parties' separation. Doby is a pastor and also works as a bus driver for the Berryville School District. In her divorce petition, Shannon asked for temporary and permanent custody of the boys. Doby counterclaimed for divorce and also asked for temporary and permanent custody.
The parties presented to the trial court an agreement for temporary joint custody on August 27, 2015. Pursuant to that order, *158 the parties were to agree on a schedule that allowed the children to spend equal time in the custody of each parent. On June 12, 2017, Shannon filed an emergency ex parte motion to prevent Doby from exercising visitation with JW because, according to her attached affidavit, Doby's lack of supervision caused five severe injuries to JW, three requiring emergency medical care and one resulting in major surgery to JW's femur.
Shannon alleged that after the femur surgery, JW had another surgery to remove hardware from his leg. Doby was present for that May 2017 surgery and postoperative instruction, which included that JW was not to bear any weight on his affected leg for six weeks. Shannon claimed that after staying with her for fifteen days following the surgery, JW stayed with his father for four days. When Shannon picked up JW from Doby's house, JW was walking, and his brothers told Shannon that he had been walking for four days. She also claimed that JW's bandage had been removed from the wound even though she had instructed Doby to keep the bandages clean and dry. Finally, Shannon claimed that Doby had removed the stitches from the wound even though JW had not had his follow-up visit with the surgeon.
The trial court held an emergency hearing on June 20. Doby testified that he understood that JW was not to bear weight on his hip or leg for six weeks. He said that there had been no instructions regarding the incision or stitches and that the doctor had said the bandage would stay on until JW's next doctor's visit. Doby said that he cared for JW for one day about eight days following his surgery. Shannon did not give him instructions that day, and JW's surgical bandages were still in place. He said that JW did not walk that day. The second time JW stayed with him was the Wednesday following Memorial Day, and he picked JW up from therapy and kept him until Sunday. On this visit, JW wore Band-Aids rather than the surgical bandages. There were two strings, about an inch long, at each end of the incision. Doby said that he took the bandages off when they became loose and did not replace them. He said that he cut the strings off because JW kept pulling at them. Doby had believed the stitches were dissolvable and would fall off anyway. He said that over those few days, JW would get up a few times, and Doby would have to take him back to the chair or the bed. Doby said that he did not allow JW to walk around freely.
Shannon said that she had taken JW to the emergency room (ER) numerous times after staying with his father and that JW had never been harmed while in her care. In 2014, she had to take him to the ER because he was unsupervised at church with his father. He had fallen face forward out of his walker into gravel. Another time, JW was with Doby over a weekend, and there was an incident at a hotel swimming pool when JW's brothers had to pull him out of the pool after he had fallen in. She claimed that Doby was not supervising JW. She said another incident occurred when JW twisted his ankle when he was with his father at church. Shannon said she had to take JW to Mediquick in Harrison for x-rays, and a splint was put on his ankle. While that splint was on, JW was at his father's house, and a basketball hit his good ankle, which became swollen. She also talked about a trampoline "incident" at Doby's house when JW broke his femur. She said that Doby called her to look at JW's leg, and she took JW to the Berryville ER. JW was "med-flighted" to Arkansas Children's Hospital for emergency surgery. She said that she was concerned that due to JW's fragileness and his medical issues, he needed to be monitored and *159 could not be treated like the other two boys, and Doby did not give him extra supervision. She asked the trial court to temporarily change custody until JW was released from doctor's care.
On cross-examination, Shannon said that the 2014 incident was before the agreed custody order in October 2015. She said that this was not JW's first surgery and that he had undergone two brain surgeries, a Nissen surgery, a G-tube surgery, and had tubes put in his ears. When questioned by the court, Shannon said that the parties split visitation by alternating three days and four days during the week. She said, "I might have them four days one week and Doby has them three, and vice versa."
Doby testified that JW had been sick since birth, and they began to see it when he was six months old. He said that there had been times after his surgeries that JW was in his sole care and custody, and there were never any issues. He said that they had a trampoline when they had lived together and that JW would sometimes get on the trampoline without Shannon. He said that the day JW broke his leg, he had been standing right there, holding the trampoline and watching JW. He said that JW was on his hands and knees and his brother was jumping, which caused JW to bounce up and awkwardly come down on his feet. Doby said that he called Shannon to come look at JW's leg, and he had not been trying to hide anything from Shannon. He said they felt that JW needed to go to the ER, and there had been no fight between them about his being negligent.
The trial court noted that the stitches had been snipped, which prevented the doctor from removing them as he normally would have, and there was testimony that JW walked to his mother in the bedroom eighteen days after surgery. The court stated, "Fathers parent differently than mothers do. From what I have heard, Mr. Williams exercises pretty fair care of [JW]." The court denied the emergency petition based on insufficient evidence.
At the temporary hearing on August 8, 2017, Shannon testified that she wanted JW to do public online schooling for the upcoming school year, and Doby wanted him to attend the Berryville School District where the other two boys went to school and where Doby drives a school bus. Shannon had moved to Harrison, and she said that if the court wanted JW to attend a brick-and-mortar school, it was her preference that he attend Green Forest because it would be convenient to both parents and because Green Forest had a smaller student-teacher ratio. She said that JW had difficulty meeting new people and adjusting to new environments due to his sensory issues.
Jennifer Fry, JW's speech therapist, described JW's therapy and sensory issues. She said that she thought JW needed to continue the maximum amount of therapy possible and that he responds well to technology. She said that Doby had been cooperative in getting JW to and from therapy. She also said that she could communicate with any therapist JW had in a school setting. Physical therapist Joann Goluch testified that she had been giving JW therapy for the last four years, that she worked mainly with Green Forest schools, and that she would be able to communicate with any public-school therapist JW might have. She did not think JW had the stamina to attend school all day, and she had concerns about his ability to physically navigate at school because of his tendency to fall. She said that no matter whether it was Green Forest or another school, she would continue after-school therapy with him if he could tolerate that much during the day.
*160 Kelly Swofford, the principal at Berryville Elementary, testified that the district has a special-education program with two resource classrooms, a special-needs classroom, and in-house occupational, speech, and physical therapists. She said to determine which services a child needs, a conference is held and an Individualized Education Plan (IEP) is made. Each child is evaluated, and she was aware that JW would need a personal aide during the evaluation period. She said that both DW and RW attend Berryville schools. She said that her school district could handle JW's special needs. Apryl Harmon, the special-education supervisor for Berryville School District, testified that the district therapists would work as a team with any of JW's therapists.
The trial court ruled that JW would attend school with his brothers in Berryville. Over Doby's objection, the trial court ruled that an attorney ad litem would be appointed, and an order was filed appointing Ryan Blue to represent the boys. On September 28, 2017, Shannon amended her complaint for divorce, alleging eighteen months' separation. Doby amended his counterclaim, alleging adultery and general indignities as grounds and asking that the joint-custody order continue or that he be awarded sole custody.
At the January 12, 2018 final hearing, the parties stipulated to a property-settlement agreement, which was read into the record. The issues remaining for the court were custody, child support, and visitation. Each party called eight witnesses; each party testified; and the attorney ad litem recommended that Shannon have primary custody.[1]
Sharon Carey, Shannon's mother, testified that she holds a "Grandma Camp" for all her grandchildren every summer and that Doby never attended. She said that in the twenty years of the parties' marriage, one instance that gave her pause about Doby's parenting skills was in 2012 when Doby told RW to put on his shoes so he could accompany Doby on his golf-cart rounds at the apartment complex he managed. When RW went to get his shoes, Doby left without him. She also said that Shannon told her that Doby had held RW's head under the water while giving him a bath in 2013, but neither she nor Shannon had reported the incident to DHS. Carolyn Chambers, Shannon's aunt, said that Doby did not interact with JW when he visited in the hospital after the surgery in May 2017. She also complained that Doby would enter Shannon's home without knocking. She said that she knew that Shannon was seeing Jeff Weatherly, but she did not know when the relationship began.
Yvonne Kessler, a fourth-grade teacher at Berryville, said that she had taught DW in fourth grade, and RW is currently in her class. She described DW as an "A" and "B" student and RW as very gifted. She said that the boys were doing well in Berryville schools, and she had no concerns about Doby's interacting with the boys at church. She also said that Doby told her he had an issue with pornography. She thought RW took care of JW at church sometimes, and she did not know who the attorney ad litem was and had not been questioned by him.
Shannon testified that she works at North Arkansas Regional Medical Center in Harrison making twenty dollars an hour. She works part time and takes home about $ 790 biweekly. She receives $ 700 a *161 month in SSI for JW. She said she had changed her mind about the feasibility of joint custody since the agreed order. Shannon said that it was difficult arranging visitation with Doby because they could not communicate and that she tried to compromise for the kids' sake. For example, Shannon had concerns about JW's attending Doby's father's funeral because Doby had planned to perform the service, which would have left JW unsupervised. She had also worried that JW would not understand the concept of death. She said that Doby had contacted the attorney ad litem to act as a mediator on this issue. She said that she agreed to allow JW to go to the visitation, but when Doby quit responding to her texts regarding the funeral, she went to his house to talk, and Doby agreed to let her have JW during the funeral. She complained that Doby had the boys all day during his father's visitation service when it had been her time to have them. She said that she had found texts from Doby on DW's phone that were disrespectful toward her because Doby had referred to her as "Shannon" rather than "your mom." She also said that Doby would not cooperate in potty training JW.
Shannon said that she found evidence in 2014 that Doby was seeing another woman when she found two Valentine cards signed by "Rita." Doby told her that they were from an old girlfriend. However, through her connections at the post office, Shannon found a woman named Rita McIntyre, whom she believed was the card sender. She sent McIntyre makeup brushes with a return receipt for her signature. The signed receipt was admitted as evidence. Shannon also testified that Doby expressed to her that he had a problem with "lust" and that she had seen an ad on their computer for a pornography website. She said that she had concerns about Doby's admitted struggle with pornography throughout their marriage, and she admitted that she had threatened to tell his church members if he did not get it under control. She said that Doby turned off the internet connection at his house. She said that Doby had demanded to take the boys to church when she had planned to take them kayaking on a Sunday. She said that their agreement was that he could take them to church on her time if she did not have something planned.
Joseph Lucas, a forensic document examiner, testified that the Valentine cards and the signed return receipt had been signed by the same person, and he was confident in that opinion. However, Rita McIntyre testified that the signature on the return receipt was hers but that the signatures on the Valentine cards were not. She denied dating Doby at any time and said that she had never had any communication or contact with him.
Chad Allen testified that he coaches youth football in Berryville; he knows the Williamses; and he described Doby as reliable in getting DW to practices. He said that the divorce arrangement had been "working" for DW. He said Shannon brought DW to one game in Pea Ridge, and DW was late, showing up after halftime.
Patty Robinson is Shannon's friend of thirty years and testified that Shannon and the children stay with her in Maumelle when JW has a doctor's visit. She described Doby as aloof and as never having looked her straight in the eye. She said that she had not had a chance to meet Shannon's boyfriend, Jeff Weatherly. She has a high opinion of Shannon and a low opinion of Doby. She said that the attorney ad litem interviewed her over the telephone.
Patricia Patty is the three boys' former babysitter. She had communicated mainly with Shannon, and she described Doby as *162 "not hav[ing] much of a conversation" with her. She concluded by saying that she did not think the boys were closer with one parent over another. Kelly Swofford reiterated her testimony from the emergency hearings. She said that both parents had been very cooperative in the IEP meetings for JW, and she did not recall any issues with the parents not being able to work together to meet RW's educational needs. She discussed one IEP meeting for which Doby failed to appear, and she determined that he had not been notified.
Carol Hines works as a classroom teacher in the special-education program at Berryville, and JW is in her program. She said that JW had accomplished several of his IEP goals and that both parents had been involved in the meetings. She believes that the parties have the ability to communicate and cooperate to do what is best for JW. She also said that she failed to give Doby notice of one of the IEP meetings, and it was rescheduled so he could attend. Leonda Davis testified that she is a math teacher at Berryville and that DW was in her class last year; DW was an excellent student; and she thinks the joint-custody situation is working.
Doby admitted that he had turned off the internet connection at his home as a safeguard because of pornography. He said that Shannon admitted in a deposition that she had begun a sexual relationship with Jeff Weatherly in 2013. He said he was not surprised that Shannon "is indicating" that she wants to pull the boys out of Berryville schools. He said that they had worked together to make a schedule that works for both them and the boys. He said that they had managed to work out their schedules for the time period Shannon was in school, when she had graduated and was not working, and when she began to work. He said that in August or September 2016, when they had been operating under the joint-custody arrangement, Shannon moved from Berryville to Harrison. He said he had helped her move to Harrison, and there was no discussion about the boys leaving Berryville schools.
During rebuttal testimony, Shannon said that she had met Jeff Weatherly online through a gaming platform in March 2013. She first saw him in person in September 2013. Jeff lives in Dayton, Ohio, and owns a car dealership there. She said that she had sex with him at their first meeting in 2013 and that she talks with him on the phone in front of the boys. She said that Jeff had given the boys gifts and that she keeps a picture of her and Jeff in her bedroom. She said that Jeff attended her graduation from nursing school in May 2016. She said that she had not seen Jeff in six months and that she did not have plans to move to Ohio. "I understand this court can fact-check me in the future if I want to move to Ohio. I do not have plans to move to Ohio while the boys are minors." She admitted that she sent the makeup brushes to Rita McIntyre from Dayton, Ohio.
After closing arguments by the parties' respective attorneys and the attorney ad litem, the trial court stated its ruling as follows:
Everyone here is concerned about the three boys. I am probably not going to entirely satisfy either side, but I am thinking of the boys in making this decision. Ms. Williams should be commended for going to nursing school. I bet [JW] was a big motivation to do that. Having a special needs child has affected everyone in the family. I have heard that both parents love their children, and all three boys love their parents.
I did not hear much during the first hearing we had. I heard [JW] walked across the carpet to see his mother when she came to visit him at Mr. *163 Williams' house. The Court previously found the stitches were not removed. The stitches were trimmed. During the second hearing, the Court found there was not sufficient evidence to move [JW] to Green Forest. It was better for [JW] to be around his brothers in Berryville.
The Court is considering the mom's professional certification and how that affects her ability to care for [JW]. The testimony of the school officials and mom's family members have played a part in this decision. With regards to the expert testimony for the handwriting on the Valentine's Day cards, I think he deviated from scientific principles by assigning his own probabilities to the characters he observed. From the perspective of a lay factfinder, the signatures do not look the same.
Ms. Williams testified her relationship with Jeff Weatherly began in 2013. She lied to her children by calling Mr. Weatherly just a friend, and Mr. Weatherly purchased expensive gifts for the children. Ms. Williams operates under rules of conduct that should apply differently to her than to Mr. Williams. The Court cannot dismiss that Ms. Williams might move to Ohio. Mr. Williams has extensive family in Berryville. Ms. Williams has extensive family in Oklahoma. I find it significant that Ms. Williams moved further away from her family when she moved to Harrison.
The Court is deviating from the ad litem's report and finding joint custody has been in place since 2015 and the preference for joint custody controls. There is more evidence that the parties are able to cooperate, and they have worked out an equal time schedule. I think it is in the best interest of the boys that joint custody continues. Education should continue in the Berryville schools until further hearing in this case. Equal time will be shared by each of the parties, and it will be according to the schedule used during the pendency of the temporary order.
The trial court granted Shannon the divorce and ordered Doby to pay her $ 621 a month in child support. The decree was filed on February 16, 2018, and it states:
In reaching this joint custody decision the Court finds the preponderance of the evidence is that since their May 2015 separation the parties work together, even though at some times they don't like each other and that there is more evidence that the parties are able to cooperate in this case as the evidence shows they have worked out an equal time schedule, worked together with school officials and therapists and together at the IEP meetings as well as changed the joint custody schedule from time to time to accommodate one another.
Shannon filed a timely notice of appeal; this appeal followed.
II. Standard of Review and Applicable Law
We recently stated our standard of review in custody cases as follows:
This court reviews child-custody cases de novo and will not reverse a circuit court's findings unless they are clearly erroneous. Gibson v. Gibson , 2010 Ark. App. 741, 2010 WL 4327099. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. Id. Because the question of whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest.
*164 Id. In fact, there are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as those involving minor children. Id.
The primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. Fox v. Fox , 2015 Ark. App. 367, 465 S.W.3d 18. Although joint custody has been disfavored in Arkansas in the past, Act 1156 of 2013 amended Arkansas Code Annotated section 9-13-101 to state that an award of joint custody is now favored in divorce proceedings. Id. When in the child's best interest, custody should be awarded in such a way as to assure the frequent and continuing contact of the child with both parents. Ark. Code Ann. § 9-13-101(b)(1)(A)(i) (Repl. 2015). Other factors that may be considered in determining what is in the best interest of the child include the psychological relationship between the parents and the child, the need for stability and continuity in the child's relationship with parents and siblings, the past conduct of the parents toward the child, and the reasonable preference of the child. Rector v. Rector , 58 Ark. App. 132, 947 S.W.2d 389 (1997).
Hortelano v. Hortelano , 2017 Ark. App. 98, at 5-6, 513 S.W.3d 890, 894.
III. Possible Move to Ohio
Shannon argues that the trial court erred in finding that she might move the boys to Ohio as a factor in the custody decision. She points out the presumption in favor of relocation for a custodial parent with primary custody in Hollandsworth v. Knyzewski , 353 Ark. 470, 109 S.W.3d 653 (2003). This presumption is not applicable when the parents share joint custody of a child. Singletary v. Singletary , 2013 Ark. 506, 431 S.W.3d 234 ; see also Cooper v. Kalkwarf , 2017 Ark. 331, 532 S.W.3d 58 (presumption favoring relocation not applicable when parents shared nearly equal time with the children).
Shannon contends that even though hers is not a Hollandsworth case, the Hollandsworth presumption is important in understanding why the trial court's analysis is wrong. She claims that a trial court cannot use joint custody as a way to preemptively defeat a future move by a custodial parent. She claims that the trial court's ruling is an end run around the proper application of the Hollandsworth presumption. She recites the trial court's mentioning that she might move the boys to Ohio and concludes that the trial court had no reasonable basis for this future prediction. She contends the court was punishing her by denying her the legal presumption that goes with primary custody. She claims that nothing in the record supports the trial court's suspicion that she would move to Ohio. She points to her own testimony in support of this argument.
We hold that the trial court did not err in considering the possibility that Shannon might move to Ohio in making its custody decision. There was extensive testimony from witnesses regarding Shannon's nearly five-year-long relationship with Jeff Weatherly, who lives in Dayton, Ohio. It was reasonable for the trial court to entertain that Shannon may wish to relocate to Ohio. Shannon denied that she planned to move but then stated that she did not plan to move while the boys were minors. The trial court's determination of credibility is given deference, especially in child-custody matters. See Hortelano, supra. The trial court noted that Shannon operates under a different standard than she expects Doby to follow, and then noted that she might move to Ohio. Reaching this conclusion after a two-day trial *165 and two prior hearings was not clearly erroneous.
IV. Shannon's Move to Harrison
Shannon states that in August 2016, she moved to Harrison, and she is now employed by the hospital there. She contends that despite her valid reasons for moving to Harrison-one county east of Doby-during the separation, the trial court held it against her. The trial court's order stated, "The Court finds it significant that [Shannon] moved to Harrison, which is further away from her family and not closer to her family." Shannon contends this finding was clearly erroneous. She also claims that holding the move against her is against the important policy concerns announced in Hollandsworth . She argues, without citing them, that countless post- Hollandsworth cases have held "to the contrary." Further, she claims that the evidence proves that moving to Harrison was not an impediment to visitation or even to the boys' continued enrollment in Berryville schools.
We hold that the trial court did not err by considering Shannon's move to Harrison as a factor in its custody decision. Doby contends that "significant" means "embodying or bearing some meaning," or "standing for something." See Black's Law Dictionary (10th ed. 2014). Thus, he contends that Shannon's move was not a major factor, as she argues, but her decision to move farther from her family was merely "meaningful." We agree. Shannon's focus on one context-free sentence is misplaced. The trial court referenced the parties' ability to work together, and almost all the evidence the court considered took place after Shannon had moved to Harrison in 2016.
V. The Preponderance of the Evidence
Shannon contends that the trial court's decision to award joint custody was clearly against the preponderance of the evidence. Shannon argues that the ad litem recommended that she be awarded primary custody, but the trial court deviated from that recommendation without discussing the evidence. She also contends that the ad litem had concerns about Doby's supervision of JW and his characterization of DW as an "embellisher." We note that the ad litem did not have the benefit of the emergency hearing or the hearing involving Shannon's request to have JW go to school either at home or at Green Forest. The trial court ruled in Doby's favor, allowing all three boys to attend Berryville. Thus, by the time the ad litem was appointed, the trial court had already heard extensive testimony from both parties and from school personnel. The trial court was in a superior position to evaluate their testimony and assess their credibility. Hortelano, supra. Further, in Brice v. Brice , 2013 Ark. App. 620, 2013 WL 5872290, this court stated that the trial court is in no way bound to follow an ad litem's recommendation.
A child's preference is a factor to be considered in determining custody. Turner v. Benson , 59 Ark. App. 108, 953 S.W.2d 596 (1997) ; see also Ark. Code Ann. § 9-13-101 (Repl. 2015). Shannon claims that despite the two oldest boys' stating to the ad litem that they wanted to live with her, the trial court did not include those preferences in the analysis. Doby contends that Shannon's argument is not clear because the ad litem stated that the boys wanted to live in Centerton or Bella Vista, which was not a choice. Both wanted the home-school program so that less work would be required of them. RW expressed a preference to live with Shannon when she was not working and to live with Doby when she is, which was not an option either. A child's preference about living with *166 a particular parent is but one factor for the trial court to consider. Neumann v. Smith , 2016 Ark. App. 14, 480 S.W.3d 197. The child's stated preference on custody is not binding on the trial court. Hart v. Hart , 2013 Ark. App. 714, at 2, 2013 WL 6271901.
Finally, Shannon contends that joint custody is inappropriate because of the lack of cooperation and communication between her and Doby. She claims that without discussing any of the evidence or insights from the ad litem's report, the trial court deviated from the recommendation and ordered joint custody. Shannon argues that even though joint custody is favored by statute, see Ark. Code Ann. § 9-13-101(b)(1)(A)(ii), this court has continued to temper the favored status with the reality that both parents must be able to cooperate and it is error to order joint custody when that cooperation is lacking. Stibich v. Stibich , 2016 Ark. App. 251, 491 S.W.3d 475.
She cites Wilhelm v. Wilhelm , 2018 Ark. App. 47, 539 S.W.3d 619, affirming the trial court's finding that it would not award joint custody when both parents did not agree to it. There, both parties had declined to entertain joint custody. Id. at 7, 539 S.W.3d at 624. Shannon argues that here, because both she and the ad litem objected to joint custody, the trial court should have refused joint custody.
Shannon made the allegation that Doby was inattentive when she filed the emergency petition for primary custody. After the trial court heard the testimony, it concluded her proof was insufficient and denied her motion. Similar testimony was presented at the final hearing. Again, the trial court found that her allegations were unsubstantiated. The trial court specifically found that the parties had a history of working together to solve scheduling conflicts and make mutual decisions.
Shannon's argument is that we should reweigh the evidence in a manner that is more favorable to her, but credibility determinations are left to the trial court, and we will not reweigh the evidence. See Colston v. Williams , 2018 Ark. App. 455, 556 S.W.3d 548 ; Glisson v. Glisson , 2018 Ark. App. 21, 538 S.W.3d 864. Given our standard of review and the special deference we give trial courts to evaluate the witnesses, their testimony, and the children's best interest, we cannot say that the trial court clearly erred in reaching its decision on the best interest of these children.
Affirmed.
Vaught and Hixson, JJ., agree.

The attorney ad litem gave each party a copy of his report prior to the final hearing; however, that report is not contained in the record. The ad litem stated his position in open court.