Cite as 2020 Ark. App. 505

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-19-873

| | | |
|---|---|---|
| JULIA MCCAY BRAND | | **Opinion Delivered:** November 4, 2020 |
| | APPELLANT | |
| | | APPEAL FROM THE JACKSON COUNTY CIRCUIT COURT [NO. 34DR-14-150] |
| V. | | |
| MICHAEL T. BRAND | | HONORABLE TOM GARNER, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## RAYMOND R. ABRAMSON, Judge

Julia McCay Brand appeals the Jackson County Circuit Court order granting Michael T. Brand's motion to modify custody of their child, M.B. On appeal, Julia argues that the circuit court erred by finding that (1) a material change in circumstances occurred following their divorce warranting modification of custody and (2) it was in the best interest of M.B. to modify custody. We affirm.

Julia and Michael married on August 2, 2008. Their child, M.B., was born on September 10, 2010. They divorced on July 7, 2016, and their divorce decree gave Julia primary custody of M.B. subject to visitation with Michael.

On June 29, 2018, Michael filed a petition to modify custody and for emergency ex parte relief. On the same day the petition was filed, the court entered an ex parte emergency order placing custody of M.B. with Michael. On July 30, the court held a

hearing, and on August 15, the court entered a temporary order denying Michael's request for temporary custody.

On May 30 and 31, 2019, the court held a hearing on Michael's request to modify custody. At the hearing, Julia testified that she has primary custody of M.B. and that they live in Newport, and Michael lives in Fayetteville. She admitted that she has hostility toward Michael because he had treated her poorly during her breast-cancer treatments and had an affair with Shayna Boyster, a family friend. She noted that the acrimony had existed during the pendency of their divorce. As to M.B., she stated that he is in the second grade. She noted that he had seen three different therapists from kindergarten to second grade and that in the last year, he had developed animosity and anger issues.

Julia admitted that she did not want to communicate with Michael and that she had refused to use a shared calendar for M.B.'s activities. She denied having told M.B.'s teacher that the teacher should not speak with Michael about M.B.'s behavior. She explained that when Michael transports M.B. to baseball games, she is apprehensive about giving him M.B.'s uniform, so she brings it to games.

Julia described an incident on Christmas Eve 2015 where she called the police to remove M.B. from Michael's family Christmas celebration. She stated that Shayna was at the house and that the court had ordered Michael not to have M.B. in Shayna's presence. Julia further testified that in January 2018, she mistakenly believed that Michael had kept M.B. over his allotted visitation. She admitted that she went to Michael's cabin, spit in his face, and demanded that he immediately surrender M.B. to her. She denied having slapped him and further stated that she went to the cabin on the advice of her attorney.

2

She acknowledged that M.B. had witnessed some of the dispute and had become upset, but she stated that a bystander removed him before the situation escalated.

In another incident, Julia testified that she had submitted photos of M.B. with bruises on his body to the attorney ad litem and M.B.'s counselor and had suggested that Michael caused the bruises with a belt. The photos show eight-year-old M.B. bending over without any clothing, with visible bruising. She recognized that a few of the photos had been taken on "separate occasions" and not immediately preceding her report. She also admitted that the report had led to an investigation of Michael by the Arkansas Department of Human Services (DHS).

She further discussed a hunting accident with M.B. where a gun misfired in an enclosed deer blind, injuring her nose and causing M.B.'s ears to ring. She explained that she immediately went to the emergency room with M.B. for treatment of her broken nose. She stated that the nurse treating her injury also inspected M.B.'s ear and did not see any issues. She did not inform Michael of the incident. She recognized that following the accident, Michael had informed her that M.B. continued to complain of ringing in his ears and that he had wanted to take M.B. to an otolaryngologist for an examination, but she refused. She also recognized that Michael eventually took M.B. to an otolaryngologist and that the doctor had recommended a follow-up visit and an appointment had been made. Julia denied canceling the follow-up appointment. However, Danielle Quesnell, a medical assistant for the otolaryngologist, testified that Julia had called the doctor's office and canceled M.B.'s follow-up appointment.

Michael testified that he and Julia have difficulties communicating about M.B. and that she is hostile toward him. He stated that after the divorce, she refused to participate in shared calendaring as recommended by their counselor. He further stated that Julia had refused to provide him with schedules for M.B.'s activities. He testified that her unwillingness to share M.B.'s schedules inhibits him from attending M.B.'s activities and hampers his ability to transport M.B. to the activities during his visitations. He stated that in 2017, M.B.'s baseball coach asked him to be an assistant coach, and when Julia learned that he would be helping with the team, Julia asked the baseball commission to transfer M.B. to another team. Michael further stated that his family lives in Newport and that Julia does not allow M.B. to see them. M.B. visits Michael's family only when Michael is in Newport.

Michael testified that Shayna is his girlfriend and that they have plans to get married. He stated that he and Shayna have traveled with M.B. and that he does not share a bedroom with Shayna when M.B. is there. He recognized that he had previously shared a bedroom with Shayna during M.B.'s visits, but after being admonished by the court, he stopped.

Michael further testified about the Christmas Eve incident when Julia contacted the police to remove M.B. from Michael's family's home. He stated that the incident occurred in 2016 after their divorce, but on cross-examination, he acknowledged the incident could have occurred in 2015. He also discussed the incident in January 2018 when Julia arrived at his cabin to remove M.B. He explained that he tried to show Julia the divorce decree to establish his right to the visitation but that Julia refused to look at

4

the decree, slapped him, and spit in his face. He explained that the police were called and that Julia had been criminally charged as a result of the incident.

He also discussed the hunting accident involving M.B. and Julia and testified that Julia did not inform him of the accident. He stated M.B. complained of ringing in his ears and that he wanted an otolaryngologist to examine M.B.'s ear, but Julia refused. He explained that he made an appointment with an otolaryngologist for M.B. and that the doctor suggested M.B. might have mild hearing loss and wanted a follow-up examination. Michael scheduled an appointment for a follow-up examination, but Julia canceled it without consulting him.

Michael further discussed the DHS investigation and denied having caused any bruises on M.B. He explained that their counselor had advised him and Julia to communicate regarding their disciplinary actions for M.B. He stated that during a visitation with M.B., he called Julia and informed her that he had planned to spank M.B. as punishment. Michael testified that after M.B. returned to Julia's home, she immediately reported the photos, but he later learned that the photos were a year old. He explained that he went to M.B.'s school for the investigation and that DHS employees removed M.B.'s clothing to check for bruises. He testified that M.B. did not want to remove his clothing in the presence of the female DHS employees and that he was "scared to death." He stated that the examination showed that M.B. did not have any bruises and that DHS found the allegations unsubstantiated.

Michael testified that he is concerned about M.B.'s behavior. He explained that M.B. is defiant and disrespectful at home and at school and that he receives reports of poor

conduct. He stated that he has been suspended multiple times in the last year. Michael testified that he has approached Julia about the behavior and that she responded that she did not have any problems with M.B. He stated that after the divorce, Julia had regularly received reports on M.B.'s conduct from his teachers and that she did not communicate the reports to him. He recognized that M.B. had behavioral issues before the divorce but stated that the issues had worsened following the divorce.

Tyler Treadway testified that he witnessed the incident between Michael and Julia at Michael's cabin in January 2018. He stated that when Julia arrived, Michael tried to read her a document from his computer screen but that she spit in his face and slapped him. He also stated that M.B. witnessed part of the incident and that he was crying.

Amy Thaxton, the principal at M.B.'s elementary school, testified that M.B. had received in-school suspension on four occasions and had also received nine referrals for misconduct in the second grade. The disciplinary issues ranged from using profane language to pushing another student to talking back to administrators. In his first-grade year, M.B. had received two referrals for misconduct, and in kindergarten, he had received eleven referrals for misconduct. Amanda Smith, M.B.'s second-grade teacher, testified that M.B.'s conduct at school concerned her. She further noted that Julia had told her to "watch what you say to [Michael] because it could be used against you."

Cody Willis, M.B.'s counselor, testified that he had counseled M.B., Julia, and Michael individually and collectively beginning in August 2018. He last saw M.B. in April 2019. He further stated that M.B. had "potentially" serious behavioral problems. He explained that M.B. is testing his boundaries and that he needs a consistent disciplinarian

to curb the behavior before he engages in riskier activities as he matures. He agreed with Michael's attorney that a strong relationship with Michael is important for M.B.

Tim Burzynski testified that he is Julia's former brother-in-law. He explained that he and Julia's sister divorced in December 2017. He stated that he helps Julia operate her farm and that his office is located in her house. He denied having a romantic relationship with Julia, but he acknowledged that he had spent the night at her house on two occasions and that she had spent the night at his house on one occasion. He further acknowledged that he had vacationed with Julia, M.B., and his children from his marriage to Julia's sister. He also testified that he had disciplined M.B., including spanking him, and that M.B.'s behavioral problems had escalated in the last year. Burzynski acknowledged that he had filed a lawsuit against Michael concerning a business contract, but he did not know that Michael had been served with the complaint on the day of the modification hearing.

Michelle Foushee, Michael's sister, testified that she lives in Newport and that since Julia and Michael's divorce, Julia had slowly alienated M.B. from her family. She explained that her family attends the same church as Julia and M.B. and that they occasionally see each other around town. She stated that M.B. appears afraid to speak to her and her family in Julia's presence.

Hunter Bowen, Julia's son from a previous marriage, testified that he and his wife have lived with Julia on and off over the last few years. He explained that they sleep in M.B.'s bedroom and that M.B. sleeps with Julia. He stated that during Julia and Michael's marriage, he had multiple physical altercations with Michael and that Michael had

provided him with alcohol at the age of thirteen. He further testified that he had seen Michael drunk on several occasions.

On June 7, the court issued a letter opinion finding that there had been a material change in circumstances since Michael and Julia's divorce and that it was in M.B.'s best interest to modify custody to Michael. The court stated that the material change in circumstances was "a course of conduct that has been pursued by [Julia] to disrupt the relationship of [Michael] and [M.B.] and to alienate [M.B.] from [Michael] and [his] family. Further, the continuing actions of [Julia] toward [Michael] have created an unsuitable and tension filled environment for [M.B.]." In making its findings, the court specifically found Julia not to be a credible witness. On July 10, the court entered its judgment granting custody of M.B. to Michael, and it attached the letter opinion to the judgment. This appeal followed.

Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Schreckhise v. Parry*, 2019 Ark. App. 48, 568 S.W.3d 782. Generally, courts impose more stringent standards for modifications of custody than they do for initial determinations of custody. *Id.* The reason for requiring more stringent standards for modifications than for initial custody determinations is to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. *Id.*

The party seeking modification of the custody order has the burden of showing a material change in circumstances. *Id.* To change custody, the circuit court must first determine that a material change in circumstances has occurred since the last order of

8

custody; if that threshold requirement is met, it must then determine who should have custody with the sole consideration being the best interest of the children. *Id.*

In reviewing child-custody cases, we consider the evidence de novo but will not reverse a circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751. Whether the circuit court's findings are clearly erroneous turns largely on the credibility of witnesses, and we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Ford v. Ford*, 347 Ark. 485, 65 S.W.3d 432 (2002). There are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as those involving minor children. *Schreckhise*, 2019 Ark. App. 48, 568 S.W.3d 782

On appeal, Julia first argues that the circuit court clearly erred in finding that a material change in circumstances occurred after the entry of the divorce decree. She specifically asserts that the court erred by relying on the Christmas Eve incident at Michael's family home because the evidence shows that incident happened in 2015, which preceded the entry of their July 2016 divorce decree. She also argues that the court erred by considering Michael's testimony that Julia removed M.B. from a sports team because the court excluded his testimony based on a hearsay objection. She further discusses the many altercations between her and Michael and claims that the quarrels amounted to petty complaints and parental gamesmanship, which cannot rise to the level of a material change

9

in circumstances, and that they had a similar combative relationship prior to their divorce. In making these arguments, she also asks this court to credit her version of the events over Michael's account.

We hold that the circuit court did not err in finding that a material change in circumstances occurred following the entry of the divorce decree. This court does not examine each finding cited by a circuit court in isolation; certain factors, when examined in the aggregate, may support a finding that a change in custody is justifiable, although each factor, if examined in isolation, would not. *Schreckhise*, 2019 Ark. App. 48, 568 S.W.3d 782. In this case, even assuming that the court erred in considering the Christmas Eve incident and Julia's attempt to transfer M.B. to another baseball team, the record is replete with evidence of an exceedingly hostile environment created by Julia following the divorce. The circuit court relied on the scheduling issues, the DHS investigation, and the altercation at Michael's cabin, all which occurred after the entry of the divorce decree, to find that a material change in circumstances had occurred. The altercation at Michael's cabin involved police intervention that led to criminal charges against Julia. Further, the court found that Julia initiated the DHS investigation solely to implicate Michael and in total disregard of M.B. Taken as whole, these circumstances easily rise above petty complaints and parental gamesmanship. Further, Julia's criminal charges and the false DHS report demonstrate a new level of hostility that did not exist prior to the divorce.

Even though Julia maintains that her testimony establishes a different version of the events, the circuit court specifically found Julia not to be a credible witness. Her argument is little more than an invitation for this court to reweigh the evidence. This is something

10

we will not do. *Szwedo v. Cyrus*, 2020 Ark. App. 319, 602 S.W.3d 759. As we have frequently stated, there are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as those involving minor children. *Williams v. Williams*, 2019 Ark. App. 186, 575 S.W.3d 156; *Gibson v. Gibson*, 2010 Ark. App. 741; *see also Hart v. Hart*, 2013 Ark. App. 714, at 2 ("Deference is especially important in custody cases because the [circuit] court is in the best position to view and judge the witnesses and the best interest of the child."). Accordingly, we find no error on this point.

Julia next argues that the circuit court erred by finding that a change of custody was in M.B.'s best interest. She asserts that the evidence shows that she is an exceptional parent to M.B. and that M.B. was thriving in her custody. She further points out that M.B. has lived in Newport his entire life where his maternal and paternal extended family also resides and that the modification of custody to Michael results in M.B.'s moving to Fayetteville. Julia additionally argues that there was evidence of poor parenting by Michael.

We hold that the circuit court did not clearly err in finding that a modification of custody from Julia to Michael was in M.B.'s best interest. The evidence established that M.B. had escalating disciplinary problems at home and at school, and M.B.'s counselor testified that he needs a strong, consistent role model to help with the disciplinary issues. There was further evidence that Julia had created a turmoil-filled environment in total disregard of M.B. Given these circumstances, we cannot say that the circuit court erred.

Affirmed.

GRUBER, C.J., and KLAPPENBACH, J., agree.

*Murphy, Thompson, Arnold, Skinner & Castleberry*, by: *Kenneth P. "Casey" Castleberry*; and *Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Brian A. Pipkin*, for appellant.

*The Law Offices of Watson and Watson, PLLC*, by: *Tim Watson Jr.*, for appellee.