Cite as 2025 Ark. App. 97

# ARKANSAS COURT OF APPEALS
## DIVISION I
### No. CV-24-316

|  |  |
|---|---|
| | Opinion Delivered February 19, 2025 |
| BRYAN NICHOLAS STEWART | APPEAL FROM THE SALINE |
| APPELLANT | COUNTY CIRCUIT COURT |
| | [NO. 63DR-20-162] |
| V. | |
| | HONORABLE KEN CASADY, JUDGE |
| KRISTIN STEWART | |
| APPELLEE | AFFIRMED |

## BART F. VIRDEN, Judge

Appellant Bryan Nicholas Stewart ("Nick") appeals from the Saline County Circuit Court's order denying his request to reallocate parenting time such that he and appellee Kristin Stewart spend equal time with their four children and denying his request to have final decision-making authority. Nick argues that the trial court erred in requiring a material change of circumstances given that the parties share joint custody of the children, and he sought a reallocation of parenting time, not a change of custody. We affirm.

### I. *Background*

The parties married in March 2006, and they have four children: a son (MC1) born in 2007; a daughter (MC2) born in 2010; a daughter (MC3) born in 2014; and a daughter (MC4) born in 2017. Kristin filed for a divorce, which was granted on June 2, 2020. The

parties entered into a property-settlement agreement, which provided the following in relevant part with regard to child custody:

a. The parties shall share joint custody of the minor children, with Mother as primary physical custodian.

b. The parties share legal custody of the minor children. Both parties shall have the right to participate in all major decisions affecting the child[ren]'s welfare, including education, non-routine medical treatment, major disciplinary measures, and social development. The parties shall discuss all such decisions and shall attempt to reach a mutual agreement based on the best interest of the child[ren]. In the event the parties cannot agree, Mother's decision shall control.

c. Each party shall make all day-to-day decisions concerning the minor child[ren]'s welfare when the minor child[ren are] in his or her respective care.

In a section titled "parenting time," the parties agreed to the following:

i. Mother shall have custody of the children, subject to Father's visitation as set forth herein.

ii. Father shall have the children every other weekend from Friday after school through Monday when school resumes. If Father is working, he shall have the children when he is not at work. For example, if Father works until 8:00 p.m. on Friday, but does not work over the weekend, Father shall have the children from Saturday morning through Monday when school resumes.

iii. The parties recognize that Father has a demanding work schedule. If Father cannot exercise his scheduled visitation, the parties agree to work together to ensure that the children and Father have some time together, even if not the entire scheduled time.

On July 19, 2023, Nick filed a motion for reallocation of parenting time and modification of decision-making authority. He cited *Nalley v. Adams*, 2021 Ark. 191, 632 S.W.3d 297, for the proposition that, when parties share joint custody, a material change in

circumstances need *not* be proved for an adjustment, or reallocation, of parenting time. Nick nevertheless alleged that, since entry of the divorce decree, there had been a change in circumstances warranting a reallocation of parenting time and listed various issues that had arisen with each child, ranging from medical issues and school matters to hygiene concerns. Nick alleged that it was in the best interest of the children to reallocate parenting time such that both parties received equal time with the children. Nick further alleged that, due to the issues raised in his petition, he should be granted final decision-making authority regarding the children's health, education, and extracurricular activities.

A hearing was held on January 12, 2024.[1] Nick testified that around March 2022, MC3 had a bladder issue that he was unaware of until he received a medical bill for the treatment that she received. Nick stated that Kristin had not informed him of this medical issue and that he had had to contact the hospital to get the records for more information. When Kristin testified, she insisted that she had, indeed, informed Nick about the treatment for MC3's bladder issue before it occurred.

Nick testified that both MC3 and MC4 had not been getting their routine medical visits for the past two years. Nick said that he had learned that the visits were scheduled but

---

[1]The appellant's brief shall contain a concise statement of the case and the facts without argument. Ark. R. Sup. Ct. 4-2(a)(6). The rule provides that the statement must identify and discuss all material facts and procedural information in the record. The rule further explains that information is material if it is essential to understand the case and decide the issues on appeal. Here, Nick's counsel has given us a "Statement of the Case" consisting of procedural highlights without any facts. We encourage counsel to familiarize herself with Rule 4-2(a)(6) before submitting another appellate brief.

that they had then been canceled, and he rescheduled them. He admitted that he did not know whether those missed visits had been made up at a later time.

Nick testified that MC1 had been experiencing headaches for the past three or four years. He said that he has not been kept informed about MC1's headaches and was not aware that MC1 had missed a significant number of days from school. Kristin testified that MC1's absences were excused. She further testified that, despite his absences, MC1's grades are good—the same as before the parties' divorce. She also said that MC1's headaches had resolved with glasses and less time spent playing video games.

Nick testified that MC2 had a severe rash that he noticed when he went to Kristin's house to drop off something. He said that the rash had been present since Wednesday but that Kristin had not sought medical treatment for MC2 by the time he first saw the rash, which was on Sunday. Nick stated that he had asked Kristin to take MC2 to see a doctor that Monday but that MC2 was not seen until Tuesday. Kristin testified that MC2 had developed the rash after going on an outing with Nick and his wife and that she had initially thought that it was poison ivy, which she treated herself. She said that, when the rash spread, she took MC2 to see a doctor that Monday.

Nick testified that MC1 takes medication for attention deficit hyperactivity disorder (ADHD) and receives allergy shots but that Kristin had stopped both of them without informing him. Nick said that he had questioned Kristin about MC1's ADHD medication but that she had claimed MC1 did not need it and was doing fine in school. Nick said that he was unaware of any doctor recommending that the medication be stopped. Kristin

4

testified that she had stopped the ADHD medication on advice from MC1's doctors at the headache clinic. The trial court asked about resuming the ADHD medication after MC1's headache issue was resolved, and Kristin explained that MC1 had complained of feeling like "a zombie." She also said that he was doing well and seemed focused at school. Nick testified that, since stopping the medication, MC1 had been falling asleep at school. Kristin conceded that one teacher had contacted her about MC1's falling asleep in class in the period after lunch, which is when he typically took his ADHD medication.

Regarding the allergy shots, Nick said that the shots had stopped a year before the hearing, but Kristin testified that MC1's last allergy shot was in October 2020. Nick said that he had in the past left work to take MC1 to get his allergy shot and conceded that the allergy-shot visits were "very difficult" to schedule. Kristin said that she and Nick had "both dropped the ball on that one" because the allergy shots were expensive, and "it took a lot of time" to get him to the visits. She told the trial court that MC1 now takes Allegra or Claritin every day and that "everything is fine."

Nick testified that MC4 was prescribed glasses when she was four and a half to five years old and that she has "a love/hate relationship" with her glasses. He said that MC4 has gone to school several times without her glasses. Nick admitted that he had forgotten to send MC4 to school with her glasses but said that he had taken them to her at school. Nick said that MC4 has lost the glasses, stepped on them, and even thrown them away. Kristin admitted that she had forgotten to send MC4 to school with her glasses, and she testified that it takes a while to order glasses when MC4 loses a pair. Nick and Kristin agreed that

5

MC4 has had about five pairs of glasses. Nick said that the school can file a FINS petition for a child being sent to school without his or her glasses. Kristin said that no school official had told her that but that Nick had told her his wife had said that.

Nick testified that Kristin did not inform him that MC1 had received a one-day suspension during the 2022–2023 school year. Kristin said that MC1 had received a one-day *in-school* suspension for throwing food and that she had learned about the suspension after the fact but had told Nick about it as shown by a text thread. Nick testified that MC1 also had thirty-six unexcused absences, eleven unexcused tardies for first period, and only three excused sick days. Nick said that he was unaware of this until he went to the school and obtained the records. He said that this did not happen when he was taking the children to school. He explained that Kristin began taking the children to school in the 2022–2023 school year. Kristin disputed the accuracy of the school records. She testified that MC1 did miss a significant number of days from school while she and his medical-care team were figuring out what was causing his headaches but that, once they did, he resumed school and has maintained his good academic standing. Kristin said that MC1 had missed fifteen days of school because he was very sick. Kristin said that MC1's absences were excused by the headache clinic but that MC1 did not provide those excuses to the school. She agreed that she, as the parent, is responsible for providing proof of an excused absence to school officials. She admitted getting MC1 to school late but explained that she must drop off MC3 and MC4 at one school and cannot drop off MC2 until a certain time and that it takes a while to get to MC1's school from there.

6

Nick said that MC1 has been on a "504 Plan" since he began taking ADHD medication. He said that there are annual meetings that he has not known about. Nick said that he had recently learned of one of those meetings because neither parent had attended, and the coordinator, Connie Thomas, had contacted him when she could not reach Kristin. Nick said that Kristin was aware of the meeting that he had rescheduled because the school had emailed both of them with the date and time but that Kristin did not attend. Kristin testified that there is a 504 Plan meeting every year and that she always attends those meetings. She said that there was one meeting that she knew in advance she would miss because of work, which was the meeting that Nick rescheduled. Kristin explained that she had met with Thomas alone both before and after the rescheduled meeting date because she has known Thomas for a while.

Nick testified that he was not in each child's school system as a contact person. He said that Kristin did not include his contact information on school forms each year. Nick said that he has since corrected that at each of the children's schools.

Nick further testified that MC4's school had contacted him to say that Kristin had sent MC4 to school in shoes that had been tied too tightly, bruising her ankles. Nick said that Kristin had claimed those were the shoes that MC4 liked. Kristin clarified that it was a pair of high tops, which fit but had been tied too tightly by a teacher. Kristin admitted allowing MC4 to occasionally wear her older sister's "puppy dog shoes," which were slip-ons that were too big, because she must "pick and choose [her] battles sometimes."

Nick testified that MC4 at the age of six can neither tie her shoes nor bathe herself. He said that MC4 also does not bathe or change her underwear on a regular basis. He further testified that MC4's hair smells bad and is "caked" with something. Nick said that she sometimes wears the same outfit all week. He said that this hygiene issue has been going on for a year to a year and a half.

Nick testified that there have been several occasions when he has called and learned that MC3 and MC4 were at home alone after school. He said that on one of those occasions, Kristin was out of town at a track meet for MC2. He said that Kristin had called him upset because MC1 was supposed to be there. Nick said that he had picked up MC1 from baseball practice and taken him to a friend's house because he did not know that MC1 was supposed to be at home watching MC3 and MC4. Nick testified that Kristin has also gone out of town and left MC1 at school following baseball practice with no way to get home.

Kristin testified that there was one occasion when MC3 and MC4 were at home alone for about ninety minutes because of a "mix-up" in that she had thought MC1 would be at home to watch his younger siblings. Kristin said that the children ride the bus home from school and that, when they arrive home before she gets there, she has a neighbor who watches them until she gets there.

The trial court ruled from the bench that, while joint custody is usually week to week, the parties had agreed to a custody arrangement in which Nick gets less time with the children. The trial court recognized that "[w]hat is pled for is reallocating of parental time to a week-to-week custody situation, which is also, in my mind, basically, a change to joint

8

custody." The trial court said that it did not see that any of the circumstances testified to by the parties were material changes sufficient to change custody. The trial court said, however, that it would reallocate some parenting time. In its written order, the trial court did not mention material change of circumstances at all. The trial court referred to the parties' agreement on custody and visitation and simply denied Nick's requests to reallocate parenting time and for final decision-making authority. The trial court did, however, modify the visitation schedule so that Nick has two and a half hours with the children every other Wednesday when he does not have weekend visitation, and he has the option to pick up MC3 and MC4 and take them to school every day. Nick filed a notice of appeal from the denial of his motion. Kristin did not cross-appeal.

## II.  *Standard of Review*

In reviewing child-custody cases, we consider the evidence de novo but will not reverse a trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Ingle v. Dacus*, 2020 Ark. App. 490, 611 S.W.3d 714. Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of witnesses, we give special deference to the superior position of the trial court to evaluate the witnesses, their testimony, and the child's best interest. *Id*. There are no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving minor children. *Id.*

While a trial court retains jurisdiction to modify an initial custody award, the standard for modification is more stringent than it is for the initial determination. *Reynolds*

9

*v. Reynolds*, 2024 Ark. App. 229, 687 S.W.3d 584. Our supreme court has said that "[a] judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the chancellor or were not known by the chancellor at the time the original custody order was entered." *Hewett v. Hewett*, 2018 Ark. App. 235, at 3, 547 S.W.3d 138, 140 (quoting *Jones v. Jones*, 326 Ark. 481, 491, 931 S.W.2d 767, 772 (1996)). The reason for this more stringent standard is to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. *Reynolds, supra.*

III. *Discussion*

A. Reallocation of Parenting Time

Nick asserts that the parties share joint custody of the children and that he was not attempting to change or modify custody; rather, he sought only to reallocate and equalize the parenting time with the children because of several ongoing issues in Kristin's home. Citing *Nalley*, 2021 Ark. 191, 632 S.W.3d 297, and *Sellew v. Davis*, 2024 Ark. App. 390, 691 S.W.3d 285, Nick argues that the trial court erred in requiring that he prove a material change in circumstances.

In *Nalley*, the parties stipulated that they would share joint legal custody of their child but that the mother would be the primary caregiver. The trial court noted that, while both parents were suitable to have custody, it would be difficult to fashion a schedule such that the parties could exercise true joint custody given that the father was living in Jonesboro and

10

the mother was living with the child to Little Rock. Later, the father moved to Little Rock and sought additional time with the child. The trial court granted the father's motion and noted that the only reason he had not received equal time with the child from the outset was that it was logistically impossible. The mother appealed, arguing that there had been no material change of circumstances because any change that occurred was brought about by the father as the noncustodial parent. The supreme court held that the material-change-of-circumstances analysis was not triggered because the father had not actually sought a change of custody given that the parties shared joint custody; rather, the father had simply sought a reallocation of parenting time such that he could spend approximately equal time with the child as contemplated by the original order.

In *Sellew*, true joint custody was likewise logistically impossible at the time of the initial custody determination. Following the parties' divorce, the mother continued to live in Florida, but the father planned to move to Maryland. Their "parenting plan" did not mention the term "joint custody" but spoke of shared parental responsibility and stated that the goal was to share time with the child as equitably as possible but that the child would reside the majority of the time with the mother. Later, both parents moved to Arkansas, and the father sought to reallocate parenting time with the child. The trial court determined that the Florida decree had granted the parties joint custody and that *Nalley* was analogous. The trial court thus granted the father's motion, and the mother appealed. We affirmed, holding that the trial court did not err in finding that a material change of circumstances was not

required to adjust the parties' parenting time and that the trial court did not err in finding that equal time sharing was in the child's best interest.

Here, the parties' agreed order contains contradictory terms, despite its suggestion—and Nick's urging—that the parties shared joint custody. The order provides that Kristin is "primary physical custodian" but that she and Nick share "joint custody" and "legal custody." Under "parenting time," the order states that Kristin has custody, subject to Nick's visitation. With joint custody, there is some question whether either parent can have "visitation" given that each has custody. *See Nalley, supra.* In *Cooper v. Kalkwarf*, 2017 Ark. 331, at 12 n.1, 532 S.W.3d 58, 66 n.1, the supreme court stressed "the need for decrees, orders, and agreements regarding custody to define terms such as 'primary physical custody' and 'joint legal custody' so that the intent and meaning of each phrase is clear to both the parties and the courts that must interpret this language." The agreed order here does not provide us with any defined terms. We would be elevating form over substance to accept the label of "joint custody" when Nick clearly had standard visitation subject to Kristin's primary custody. *Ark. State Bd. of Licensure for Pro. Eng'rs & Pro. Surveyors v. Callicott*, 2016 Ark. App. 476, at 8 n.4, 503 S.W.3d 860, 865 n.4 (noting that the label attached to written material should not control over the actual content thereof); *Hinton v. Bethany Christian Servs.*, 2015 Ark. App. 301, at 4, 462 S.W.3d 361, 363 (despite trial court's label of its order as one for "Permanent Guardianship," appellate court treated it as temporary in nature based on content in body of order). Given the ambiguity of the parties' agreed order, we may look to the parties' testimony about what they intended, as well as their conduct. *Jones v. Jones*, 2015 Ark. App.

468, 469 S.W.3d 402; *see also Armstrong v. Draper*, 2019 Ark. App. 114, at 6, 571 S.W.3d 60, 63 (recognizing that an arrangement in which the parents had "joint custody" of their baby with the mother having "primary" custody was ambiguous such that we looked to the parties' statements and conduct to determine the custody terms in a relocation case). Nick indicated during his testimony that he essentially accepted the less-than-equal-time-sharing custody arrangement because Kristin had threatened "to put [him] six feet underground if [he] tried to go for 50/50," and "so, for the kids, [he] did it because [he] thought it was in their best interest." Nick further testified that he "gave [Kristin] the responsibility to take care of them." Moreover, we know that Nick's work schedule played a role in structuring the parenting-time section of the agreed order. Unlike *Nalley* and *Sellew*, in which true joint custody was logistically impossible at the time of the initial custody determination, the agreed order indicates that both Nick and Kristin lived in Saline County. Further, Nick testified that, between the date of the parties' divorce and the date he filed his motion for a reallocation of parenting time, he has lived within thirty minutes of where Kristin lives with the children. Although Nick insists that the parties shared "joint custody" because their agreed order says so, Nick had the children only every other weekend, or approximately 15 percent of the time. Given the ambiguity of the agreed order, testimony indicating that 50/50 parenting time was not contemplated, and the practice of the parties with regard to custody, we conclude that Nick and Kristin did not share joint custody and that Nick actually sought a modification of custody, not simply a reallocation of parenting time pursuant to *Nalley* and *Sellew*.

13

While we have struggled with how to implement the legislative direction in favor of joint custody, Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)* (Supp. 2023), especially when it comes to modifications, we have concluded that there is one constant. Any modification of an original determination requires changed circumstances—whether it is a modification of custody or of visitation and whether it is a modification toward or away from a joint-custody award.[2] In *Baggett v. Benight*, 2022 Ark. App. 153, 643 S.W.3d 836, we held that the burden of proof is the same for a modification of custody and a modification of visitation—a party must demonstrate a material change in circumstances. In *Baggett*, the parties were originally granted joint custody, but the father later agreed that the mother should have legal and physical custody and that he should receive standard visitation. Similar to the case at bar, the father then sought to move from standard visitation back to having equal time with the children and asserted that he did not need to prove a material change in circumstances because he did not seek to change custody. In affirming the trial court's denial of the father's motion, we noted that the burden is the same for a modification of custody or visitation. In *Heileman v. Cahoon*, 2024 Ark. 164, 699 S.W.3d 85, the parties originally agreed to share true joint custody of their children. Later, the mother sought full custody, alleging a material change of circumstances. The trial court found that there was insufficient evidence to

---

[2]Arguably, even a modification, or reallocation, of "parenting time" requires some degree of changed circumstances. Although not triggering a material-change-of-circumstances analysis requiring that the moving party prove a material change, in both *Nalley* and *Sellew*, there were, in fact, changed circumstances given that the subsequent relocation of one parent removed the logistical barriers that prevented the parents from exercising the true joint-custody arrangement contemplated by the original custody order.

overcome the presumption of joint custody but that there had been sufficient evidence of changed circumstances to modify the "custodial schedule." In reversing the trial court's decision, our supreme court noted that the father's parenting time had gone from 50 percent to about 26 percent and said that

> [l]itigants, lawyers, and circuit courts alike need to understand the weight an initial custody determination is given—whether agreed on by the parties or litigated before the court. And when circuit courts are adjusting parenting time, they should be cognizant of the terminology they use and pay attention to whether an adjustment in schedule might turn into a de facto change in custody. Moving forward, after an award of joint custody is reduced to a court order, the only way to modify away from joint custody, absent an agreement of the parties, is by proving *both* a material change in circumstances *and* that the modification is in the best interest of the child.

*Id.* at 8–9, 699 S.W.3d at 90.

The party seeking modification has the burden of showing a material change in circumstances. *Hewett, supra.* In order to change custody, the trial court must first determine that a material change of circumstances has occurred since the last order of custody, and if that threshold requirement is met, it must then determine who should have custody with the sole consideration being the best interest of the child. *Stormes v. Gleghorn*, 2022 Ark. App. 416, 653 S.W.3d 820. Here, Nick essentially sought a modification of custody, and although his argument is that he did not have to prove a material change in circumstances, he alleged that several material changes had occurred with respect to the children and testified to those changes at the hearing. Moreover, during Nick's testimony, the following colloquy occurred:

THE COURT:     Well, sir, this was an Agreed Order that y'all did, so [Kristin's counsel] will ask you eventually, but I'll cut to the chase and ask it myself. What is different now than when you agreed to this

and you put her in charge of making the final decisions and put her in charge of having the kids most of the time?

MR. STEWART: I don't know that there's anything different, other than it was a situation I had never been through before. Um, I didn't ~ I didn't anticipate a divorce in the first place, and when it all ~ you know, when you're ~ well, from my perspective, when you're trying to emotionally go through that, I took a lot of considerations on my kids. I didn't want to change their situation too much. I wanted to try to keep it as stable as I could. Now, there were hearsay comments that I won't bring up that were made to make sure that, you know, we didn't get 50/50, but at the end of the day, I not confuse the kids and overly restructure their entire life too much. I work a lot.

THE COURT: Okay. Well, do you have those same concerns now?

MR. STEWART: No.

THE COURT: All right. Why not?

MR. STEWART: Well, I've made adjustments to my work schedule. At that point, I used to work til 7. I've made adjustments to work til 6. My flex schedule is a little bit better than what it used to be, and I've, honestly, just sat down with my general manager a lot and discussed ~ he ~ we've had a conversation about this situation for over a year now, and he understands what it would take for me to be able to take on more responsibility with the kids. And if anybody knows the place that I work, they understand family, and they understand all of the things that come along with it. But I have remarried. I have support. Obviously, in that way, my job has given me support. I've changed my hours at my job. I don't work weekends anymore unless requested. It's just more on a fill-in basis. So I've just got a lot more flexibility. But at the end of the day, it's changing because of all of the things ~ the situations that I'm seeing with the kids.

It is clear from the trial court's oral ruling that Nick failed to carry his burden of proof. When an oral ruling explains the simple denial in the written order, we routinely rely

16

on a trial court's oral statements from the bench to inform or to explain the reasoning behind a written order. *Martin v. Higgins*, 2024 Ark. App. 1, at 4 n.3, 682 S.W.3d 357, 359 n.3. The trial court plainly stated at the hearing that it did not see that any of the circumstances testified to by the parties were material changes sufficient to modify custody.

During Nick's testimony, the trial court pointed out that the long-standing hygiene problems with MC4 were obviously occurring at his home as well as at Kristin's. The only other issue that seemed to give the trial court some pause was the fact that Kristin did not resume MC1's ADHD medication after his headaches had resolved, but the trial court may have been satisfied by Kristin's testimony that MC1's grades were good—the same as before the parties' divorce. In summary, we cannot say that the trial court clearly erred in denying Nick's motion on finding that he failed to satisfy the more stringent standard necessary to modify an initial custody arrangement—regardless of its nomenclature—in that he did not prove that a material change of circumstances had occurred since entry of the parties' agreed order.

## B. Final Decision-Making Authority

Nick argues that, although he has a right to participate in all major decisions involving the children, he has been left out of those decisions. He asserts that, when one parent fails significantly in coparenting, that parent should not have authority to make final decisions. Nick argues that being the parent with final decision-making authority comes with responsibility but that Kristin "does what she wants to do when she wants to do it."

17

The parties' agreed order provides that they will cooperate in exchanging information to allow each other the opportunity to attend school and extracurricular meetings, conferences, performances, practices, rehearsals, and other activities and that they will make every effort to provide the other party in a timely manner with any and all information pertaining to the children's health, welfare, education, and activities. The order further provides that "it is understood and agreed that each parent has equal responsibility to keep themselves informed as to the child[ren]'s school activities insofar as such information is readily accessible." There was evidence from which the trial court could find that Nick did not keep himself informed. For example, it was not until shortly before the hearing that Nick ensured that each child's school had him listed as a contact person. Also, Nick testified that he was unaware of meetings to discuss MC1's 504 Plan, even though they are annual meetings. Giving due deference to the trial court's credibility determinations, we cannot say that the trial court clearly erred in denying Nick's request for final decision-making authority.

Affirmed.

KLAPPENBACH, C.J., and HARRISON, J., agree.

*LaCerra, Dickson, Hoover & Rogers, PLLC*, by: *Traci LaCerra*, for appellant.

*Terrence Cain*, for appellee.