Cite as 2025 Ark. App. 550

# ARKANSAS COURT OF APPEALS

DIVISION III
№. CV-25-7

| | | |
|---|---|---|
| KRISTIN COLEMAN | | Opinion Delivered November 12, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE BAXTER |
| V. | | COUNTY CIRCUIT COURT |
| | | [NO. 03DR-22-406] |
| JUSTIN COLEMAN | | |
| | | HONORABLE JOHNNIE A. |
| | APPELLEE | COPELAND, JUDGE |
| | | |
| | | AFFIRMED |

**MIKE MURPHY, Judge**

Appellant Kristin Coleman appeals from the decree of the Baxter County Circuit Court divorcing her from appellee Justin Coleman. On appeal, Kristin argues that the circuit court erred when it (1) modified the parties' oral property agreement and (2) awarded primary custody of the parties' minor children to Justin. We affirm.

I. *Background*

The parties were married in August 2013 and have two children together. On November 7, 2022, Justin petitioned for divorce and sought custody of the parties' two children, nine-year-old MC1 and nineteen-month-old MC2. Kristin answered and counterclaimed for divorce and custody. On July 11, 2023, the parties reached an agreement that was read into the record. For visitation and child support, the parties would share week-on week-off joint custody, and child support was to be set pursuant to Administrative Order

No. 10. The parties further agreed to split daycare costs equally; Justin would carry the children on his insurance; and the parties would split uncovered medical expenses.

The parties also reached the following agreement concerning property:

[Justin] in exchange for a Quit Claim Deed to the marital residence is going to pay off the loan on [Kristin's] jeep, tender her an $8,000 amount for the equity. He will keep his vehicles, the mower, the boat, in addition to the house. He will also assume joint marital debt, loans, and credit cards – there's an FNBC loan for $5,250.00, vehicle loans in the amount of $8,750.00 and $12,425.00, and then an Apple credit card with $4,246.00 on that. . . . [Kristin] will be entitled to items - miscellaneous items of furniture, kitchen [items,] personal items to include televisions at her desire to remove those from the marital home. Kristin has an Amazon credit card and TJ Maxx credit card that she'll be solely responsible for[.]

Kristin reduced this agreement to writing and sent it to Justin for review; however, it was not signed by Justin because he felt that it contained errors. Kristin filed the document signed only by her on September 13.

On September 20, Justin filed a motion for ex parte emergency custody and permanent custody citing an incident that happened with Kristin that day. The court held a hearing on the petition on October 3 and established temporary custody. According to the order granting the motion, Kristin "had a serious wreck and [was] cited for a DWI roughly an hour after dropping her children off at school."

At the hearing, Kristin testified that the evening before the wreck, she had been drinking vodka in her car well into the morning after the children had gone to bed. She testified that she had a flat tire, which made her late dropping the children off at their schools that morning. According to testimony, Kristin then went to work but was too upset to go inside. Allison Wilber, a coworker, visited Kristin in the work parking lot after Justin texted

2

and asked her to check on Kristin. When Allison saw Kristin in the parking lot, she said Kristin seemed very upset, and Kristin told her she was upset about her marriage falling apart. Allison said she went inside to notify their supervisor that she was helping Kristin in the parking lot, but when she went back outside, Kristin was no longer there.

Kristin had left work to go to River Lodge, an assisted-living facility where her mother with dementia lived. An officer with the Mountain Home Police Department testified he was called out to a single-vehicle accident at River Lodge around 10:30 a.m., where he discovered that Kristin's vehicle had hit a light pole and turned over on its side. He testified he found a broken bottle of vodka and a THC vape pen. He stated that although he did not have a blood-alcohol-content result, he charged her with DWI. He said she appeared to be intoxicated because she had slurred speech, and he detected the odor of intoxicants on her breath.

At the time of the hearing, Kristin's supervisor was letting her stay at her house.

After the temporary hearing, the court found an emergency existed and granted Justin temporary custody by order filed October 4, 2023. Notably, the order found,

> The purpose of this court is not to get help for Ms. Coleman. That task is her own responsibility. Ordering rehab, counseling, AA, NA or monitoring is all well and good, but without her willingness to change they will be useless. If Ms. Coleman wants to do what is right for her children, then she will do some combination of those things without the Court's direction[.]
>
> . . . .
>
> The incident at issue at the hearing may have been a one-time scenario, however the Court is not comfortable making that assumption. A more concerning issue is the failure of Ms. Coleman to address her vehicle situation, driver's license and

transportation issues or any long-term solutions. At this point she will be relying solely on the kindness of her co-worker for support.

Kristin's visitation with her children was to be supervised until November 1.

A final hearing was conducted on April 2, 2024. Before the start of testimony, Kristin asserted that she no longer believed the agreement read into the record in July was enforceable. Justin disagreed and believed the agreement was enforceable as to the property provisions and that the only issue before the court was custody. Kristin ultimately relented and agreed with the original property division "as long as [she's] actually getting paid in this agreement" because at that point, there had been "no change of hands on any property." Justin contended that the testimony would establish that he had done virtually everything with regard to the property provisions read into the record. The court then announced it would take testimony on both property and custody issues.

Justin testified first. He explained that he originally agreed to joint custody because he trusted that Kristin had overcome her issues with alcohol that had come up during the marriage, but after the wreck, he could no longer give her the benefit of the doubt. Although Justin was supposed to receive the marital home under the July 2023 oral property-

settlement agreement, he was currently living in his parents' home at the time of trial. He continued to pay the mortgage on the home and testified he did not live there because ownership was unclear, and the home needed repairs. Justin testified he paid off the debt on Kristin's vehicle with the insurance proceeds from her wreck. The policy was only in Justin's

4

name. He paid an additional $20,200 to Kristin from the insurance settlement for the additional value for the total loss of the vehicle.

Justin testified one problem he had with the July 2023 oral property-settlement agreement was its failure to specify items within the home Kristin would receive because she later made clear she wanted to "clean out" the home. He said Kristin had not been paying her half of MC2's daycare costs. Last, he expressed concerns about Kristin leaving MC1 at the nursing home unattended.

Kristin testified that she moved into her current apartment a month and a half before the final hearing. She explained she had not paid more to support the children during the divorce because of other expenses she had due to her wreck. Kristin's DWI case remained pending. Kristin testified that she "did not think [she] was that drunk" the day of her wreck, even though her blood alcohol content was .228. Regarding the temporary ankle device that measured Kristin's alcohol consumption, Kristin testified that she stopped wearing it because it was expensive and that it was redundant because she had an ignition interlock device in her car. Kristin testified she no longer drinks hard alcohol since the wreck but that she will consume beer or "twisted teas" maybe once a week when she does not have the kids. She said she only drinks socially. When asked about attending rehab, she said she did not pursue it because she could not take off work. Kristin testified that she obtained her medical marijuana card on March 1, 2024, to treat her PTSD.

Kristin admitted she will occasionally leave MC1 at the River Lodge nursing facility with her mom on days he does not have school. According to Kristin, there are people who check on her mother periodically, and MC1 could text her on his iPad if he needed her.

Kristin also addressed two previous temporary orders of protection (one in 2019 and one in March 2023) she obtained against Justin during the marriage. She said her and Justin's arguments would get heated, but she ultimately dismissed them both in order to try to reconcile.

Kristin's therapist, a licensed clinical social worker, testified on her behalf. She had been treating Kristin for over two years. Although Kristin discussed her DWI with the therapist, she did not learn about the marijuana usage until the week before trial. The therapist had diagnosed Kristin with an anxiety disorder and adjustment disorder. In the therapist's opinion, Justin and Kristin's relationship was volatile. Kristin had disclosed to her a previous separation and divorce action in which Justin received custody of their only child at the time.

Allison testified again at the final hearing. During this testimony, Allison stated she was unable to smell anything since having COVID, so she was uncertain whether Kristin smelled of alcohol on the day of the wreck. Allison had seen Kristin intoxicated to a point similar to what she observed on the day of the wreck on two prior occasions. She said alcohol was "problematic in the past" for Kristin. Allison believed Kristin had moved past her alcohol problems after the car wreck, and she assumed Kristin had stopped drinking alcohol. Allison testified that she knew MC1 would go to the River Lodge facility at times.

Mindy Perry, the River Lodge administrator, testified that she did not believe MC1 was ever left alone with Kristin's mother. Mindy said she visits Kristin's mother several times a day. She explained Kristin's mother has "dementia pretty bad" and can be hard to deal with, so she would have some concerns if a child was left alone with Kristin's mother. According to Mindy, Kristin's mother is not capable of looking after a ten-year-old.

The court took the case under advisement and entered a decree on September 13, 2024. In the decree, the court recited the parties' oral agreement on the record at the July 11 hearing. It further found:

8. Mrs. Coleman argues that the parties should not now be bound by the agreement regarding marital property read into the record or the Property Settlement Agreement she alone signed. Essentially, she argues that since the parties could not agree on specific language regarding the property division before her drunk driving accident, which necessitated the deviation of the custody arrangement the parties had made, she should not now be bound by that agreement read into the record with respect to the property division.

9. The Court does not believe that the subsequent change in the custody portion of the agreement automatically invalidates the property settlement portion of the parties' agreement. Here the parties agreed to the terms in the presence of the Court under oath. Additionally, Mrs. Coleman had her attorney prepare paperwork that reaffirmed that agreement.

10. The evidence at the final hearing shows that Mr. Coleman is in possession of the marital home and has been paying the debt on that home. He has paid the marital FNBC loan, and Apple Credit Card debt. After the wreck, Mr. Coleman's auto insurance paid off the remaining balance on [Kristin's] Jeep. Additionally, there was a balance over and above the payoff on the Jeep that was paid out to Mr. Coleman. Mr. Coleman then gave the balance of approximately $20,000.00 over to Mrs. Coleman.

11. Mrs. Coleman now contends that either Mr. Coleman owes her an additional $12,425.00 for the payoff on the Jeep, or that the Court should throw the parties agreement out and order all the assets sold. Both these results are

7

absurd. Mrs. Coleman is bound by the agreement that she made and then reaffirmed. She has been paid the value of her Jeep from the insurance proceeds that Mr. Coleman voluntarily turned over to her. Neither party retained this vehicle.

12.     Mr. Coleman has partially performed his portion of the agreement and represented to the Court that he stood ready to pay the additional $8,000.00 to Mrs. Coleman upon receipt of the executed quit claim deed. The Court adopts the agreement of the parties with regard to the division of their marital property as announced on the record on July 11, 2023. The Court Orders Ms. Reed to prepare a Quitclaim Deed for the property to be executed by Mrs. Coleman, at which time she will receive the $8,000.00 Mr. Coleman owes her. This exchange will take place within the next thirty days as arranged by the parties' attorneys. Additionally, the parties, through their attorneys, will schedule a time for Mrs. Coleman to retrieve her personal belongings, if she has not already done so.

The court also found by clear and convincing evidence that joint custody was not in the children's best interest, and it awarded Justin primary custody. To support its ruling, the court's order made the following pertinent findings.

15.     The Colemans have been through court once before when they only had one child. Pursuant to that case, Mr. Coleman was given sole custody of the child for reasons relating to her alcohol usage.

. . . .

17.     The main focus of the Court's first hearing in this matter was the incident on September 20, 2023 where Mrs. Coleman was intoxicated, drove her children to school, and subsequently totaled her vehicle into a sign in front of her mother's assisted living facility. She testified the prior night she put her two children to bed then proceeded to drink heavily in her car by herself. She had lost her drivers license and was moving the children in with a co-worker. The Court had concerns at the time of that hearing that her use of alcohol was excessive and problematic. The Court urged her at that time to get herself help for her addiction.

18.     At the hearing held April 2, 2024 Mr. Coleman testified he was living with the two children and his parents. He has been providing for the children's needs,

including paying $1750 since December 2023 for daycare and continuing insurance coverage for the children. Mrs. Coleman has not provided any financial assistance to Mr. Coleman save one $60.00 daycare payment.

. . . .

21. Mr. Coleman acknowledged that Mrs. Coleman had some long-standing issues with alcohol. He thought in July of 2023 that those issues had been resolved, that is why he initially agreed to joint custody. He seemed unsure that she had dealt with her alcohol issues and stated he did not really trust Mrs. Coleman. He testified regarding an incident in the past where he came home, and she was intoxicated to the point of passing out while she had one of the children in the pack in play as an infant. Mr. Coleman was aware that Mrs. Coleman was enrolled in therapy but says she limits the information that she gives him. He testified Mrs. Coleman swore to him she was not intoxicated at the time of the accident, but he was made aware later that was not the truth.

22. Mr. Coleman reported that the communication between them sometimes got heated but that they try to only speak about the children

. . . .

28. Mrs. Coleman admitted that she still drinks beer or "twisted teas." She made light of the fact that she no longer drinks alone. She drinks on average "a couple." She no longer drinks hard alcohol at all. She testified it was not uncommon for her to go out to friends' houses and stay the night when she doesn't have her children. She understands Mr. Coleman's concerns but agrees that she has not stopped drinking alcohol, but she could do so if she desired. She has not told Mr. Coleman she still drinks. She is seeing a counselor and has taken some drug and alcohol classes. She reported that rehab was not an option because she could not go to rehab and keep a job. At the end of the hearing, she admitted that she thought she should stop drinking but that she had not.

. . . .

35. The Court finds that sufficient evidence has been presented to overcome the joint custody presumption. The fact that Mrs. Coleman sought no additional assistance with her obvious alcohol problem is baffling to this Court. The Court made suggestions of programs that would help Mrs. Coleman at the emergency hearing. She chose to only continue her previously arranged mental

9

health counseling without attempting to address specific issues of substance abuse. Additionally, she has introduced an additional substance into her lifestyle. It defies logic that Mrs. Coleman maintains that she doesn't have a problem with alcohol and that she can give it up anytime, however she admits to continuing to drink. The Court does not trust that she can make good decisions for herself, let alone her two children.

From this order, Kristin appeals.

## II. *Standard of Review*

We conduct a de novo review in appeals from decrees of divorce and child-custody matters. *McCandlis v. McCandlis*, 2024 Ark. App. 339. Under our standard of review, this court will not reverse the circuit court's findings unless they are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

## III. *Discussion*

## A. Property

Kristin first argues that the court erred in modifying the oral property agreement by allowing Justin to use the insurance proceeds to pay off the vehicle. She contends that if Justin had paid off the vehicle himself like he agreed on the record, there would have been no money owed on the vehicle, and when it was declared a total loss, she would have received a check for the full value instead of the balance of the value less the lien payoff. She claims

that to allow Justin to satisfy his contractual obligation with what should have been her equity in the vehicle is clearly erroneous and should be reversed.

While the agreement was never reduced to writing and signed by both parties, the agreement was read into the record and approved by the court. Notably, before the wreck, Kristin drafted, signed, and filed the agreement indicating she wanted to be bound by it; and at the final hearing, Justin believed the agreement concerning the property division was enforceable. Arkansas courts have held that property settlement agreements announced in open court and accepted by the parties can constitute binding independent contracts, even if not reduced to writing or signed. *See Linehan v. Linehan*, 8 Ark. App. 177, 649 S.W.2d 837 (1983). It is well established that, when parties enter voluntarily into an independent property settlement agreement, it cannot subsequently be modified by the court. *Tiner v. Tiner*, 2012 Ark. App. 483, at 8, 422 S.W.3d 178, 183. Property settlement agreements, especially after approval by a circuit court, are considered binding and final contracts between the parties. *Id.*

Here, the oral agreement required that Justin satisfy the Jeep's loan and tender Kristin $8000 in exchange for a quitclaim deed to the house. There was no specific performance date provided in the agreement. Additionally, Kristin's wreck before the agreement was completed impacted its enforceability. Kristin mischaracterizes the court's finding as a modification of the original agreement; rather, the court was enforcing the agreement the parties already made. Accordingly, the circuit court did not err when it concluded that once

11

Justin tendered $8000 to Kristin, his end of the bargain would be satisfied because the remaining balance on the Jeep's lien had been paid.

## B. Custody

Next, Kristin argues that the circuit court erred when it found that Justin had overcome the presumption favoring joint custody. Arkansas Code Annotated section 9-13-101(a)(1)(A)(iii) (Supp. 2023) provides that joint custody is favored in Arkansas. In an action concerning an original custody determination, there is a rebuttable presumption that joint custody is in the child's best interest, but this presumption may be rebutted if the court finds by clear and convincing evidence that joint custody is not in the child's best interest. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)* & *(b)(1)*. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *McCandlis*, 2024 Ark. App. 339, at 8–9.

While there is a statutory preference for joint custody, this preference does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child. *Id.* We refuse to reweigh the evidence and find differently than the circuit court regarding the appropriateness of joint custody and the credibility of the witnesses. *Id.* Each child-custody determination ultimately must rest on its own facts. *Id.*

In this case, we hold that the circuit court did not clearly err in finding that Justin rebutted the presumption for joint custody. Kristin again mischaracterizes the issue; the court's custody determination was not merely based on the fact that Justin no longer trusted her around alcohol. Kristin has had a long, problematic history with alcohol, and the DWI

was not an isolated incident. Notably, in a previous divorce action, Justin received sole custody of the parties' minor child due to Kristin's alcohol use. The court's written temporary order advised Kristin to seek out a combination of assistance, but more than six months later, Kristin continued to drink alcohol. Overall, Kristin's argument on appeal is an impermissible request to reweigh the evidence. Recognizing the superior position of the circuit court to evaluate the witnesses, their testimony, and the children's best interest, we find no error.

Affirmed.

GLADWIN and HIXSON, JJ., agree.

*Benjamin Gibson*, for appellant.

*Emily Reed*; and *Blair & Stroud*, by: *Barrett S. Moore*, for appellee.