Cite as 2026 Ark. App. 193

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-25-191

| | |
|---|---|
| CANDACE HILDRETH (NOW MENDEZ) | Opinion Delivered March 18, 2026 |
| APPELLANT | APPEAL FROM THE SALINE COUNTY CIRCUIT COURT [NO. 63DR-17-795] |
| V. | |
| JOHN HILDRETH | HONORABLE BRENT DILLON HOUSTON, JUDGE |
| APPELLEE | AFFIRMED |

**CINDY GRACE THYER, Judge**

Candace Hildreth (now Mendez) appeals a Saline County Circuit Court order that granted appellee John Hildreth's motion to modify the couple's child-custody arrangement. On appeal, Candace argues that the circuit court erred in modifying the joint-custody arrangement because there was no material change in circumstances and because modification was not in the best interest of the couple's minor child (MC). We find no error and affirm.

I. *Factual and Procedural Background*

Candace and John were married in 2010 and have one child, MC, who was born in 2012. The couple was divorced by a Garland County Circuit Court decree entered on March 18, 2016; at that time, the circuit court awarded Candace and John joint legal custody with a "week-on/week-off" schedule.

Candace moved to modify the custody arrangement in March 2017. She noted that she resided in Bryant and John resided in Arkadelphia; therefore, because MC would be starting kindergarten in August, their living arrangements would make joint physical custody impossible. John responded and moved to dismiss, noting that at that point, no determination had been made as to where the child would enroll in school and that there had therefore not been a material change in circumstances.

The case was transferred from Garland County to Saline County in July 2017, and in December 2017, the circuit court entered an agreed temporary order that was intended to establish custody of MC until the end of the school year. The order continued joint physical custody on the week-to-week schedule and directed that the party having physical custody was responsible for taking MC to and from school in Bryant. MC was also allowed to participate in extracurricular activities in Saline County.

Candace and John both moved to modify custody in the spring and summer of 2019, trading accusations of hostilities. The court ordered Candace and John into mediation in August 2019. Thereafter, on December 30, 2020, the circuit court entered an agreed order. In this order, the court maintained joint legal and physical custody of MC, with the parties to continue to exercise week-to-week custody of the child, exchanging her on Mondays after school. Candace and John were directed to make joint legal decisions, with John making final decisions on medical issues and Candace making final decisions regarding educational issues in the event they were unable to agree on those decisions. The court also allowed the parties to enroll MC in one extracurricular activity each year so long as the activity did not

2

have practice or meet more than once a week. Candace and John were ordered to submit to coparenting communication classes and were directed to not speak ill of each other in MC's presence.

In March 2024, Candace filed a motion for contempt and for modification of the December 2020 order. In it, she complained that she had been excluded from accessing MC's medical portal and that John's current wife (who is also named Candace) had completed MC's HIPAA forms as parent/guardian and was listed as the main emergency contact on MC's medical records. Additionally, Candace asserted that the December 2020 order had given her final authority to make educational decisions if she and John were unable to agree, but John had unilaterally decided that MC would not be attending summer school even though her school recommended that she attend. Candace further complained that John had fostered alienation between MC and her and refused to coparent. She therefore asked the court to hold John in contempt and to modify certain aspects of the decree, although she did not ask for modification of custody at that time. John responded to Candace's motion and counterclaimed with a request that custody of MC be placed with him.

The circuit court held a hearing on the parties' competing motions on December 2, 2024, and heard testimony from John, John's current wife, MC, Candace, Candace's mother, and Candace's current husband. After taking the matter under advisement at the end of the hearing, the court entered an order on December 4 in which it ultimately determined that a material change in circumstances had occurred. On this point, the circuit

3

court specifically cited John's relocation to Garland County and the difficulty this placed on MC's ability to fully engage in extracurricular activities; the deterioration of the relationship between Candace and John's current wife; the additional deterioration of the relationship between Candace and MC; and MC's expressed preference to live with John. The court further found that it would be in MC's best interest to maintain joint legal custody but for physical custody to be placed with John, subject to Candace's every-other-weekend visitation. The court also modified Candace and John's parental responsibilities, making John the primary decision maker for educational and medical decisions in the event they could not reach an agreement on those issues.

Candace filed a timely notice of appeal and now argues that the circuit court erred in modifying the child-custody arrangement because there was no evidence of a material change in circumstances, the unequal division of custodial time is inconsistent with the retention of "joint custody," and the modification was not in MC's best interest.

## II. *Standard of Review*

Child-custody cases are reviewed de novo on appeal, but we will not reverse a circuit court's findings of fact unless they are clearly erroneous. *Carrillo v. Morales Ibarra*, 2019 Ark. App. 189, 575 S.W.3d 151. A finding of fact is clearly erroneous if, after reviewing all the evidence, the appellate court is left with a definite and firm conviction that a mistake has been made. *Id.* Whether a circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses; therefore, we give special deference to the circuit court's superior position to evaluate the witnesses, their testimony, and the child's best interest. *Redman v.*

4

*Redman*, 2024 Ark. App. 562, 701 S.W.3d 40. There are no cases in which the circuit court's superior position, ability, and opportunity to observe the parties carry as great a weight as those involving minor children. *Id.* The primary consideration in child-custody cases is the welfare and best interest of the child; all other considerations are secondary. *Id.*

### III. *Discussion*

Modification of custody is a two-step process: first, the circuit court must determine whether a material change in circumstances has occurred since the last custody order; and second, if the court finds that there has been a material change in circumstances, the court must determine whether a change of custody is in the child's best interest. *Wallis v. Holsing*, 2023 Ark. App. 137, 661 S.W.3d 284. A child-custody determination is fact specific, and each case ultimately must rest on its own facts. *Graf v. Graf*, 2024 Ark. App. 212, 686 S.W.3d 912. We will not substitute our judgment for that of the circuit court, which observed the witnesses firsthand. *Id.*

A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child or when there is a showing of facts affecting the best interest of the child that were either not presented to the circuit court or were not known by the circuit court when the original custody order was entered. *Dorrell v. Dorrell*, 2014 Ark. App. 496, 441 S.W.3d 925. In making a decision whether a modification of custody is in a child's best interest, the circuit court should consider factors such as the psychological relationship between the parents and children, the need for stability and continuity in the relationship between

5

parents and children, the past conduct of the parents toward the children, and the reasonable preference of the children. *Bamburg v. Bamburg*, 2014 Ark. App. 269, 435 S.W.3d 6; *Rector v. Rector*, 58 Ark. App. 132, 947 S.W.2d 389 (1997). In addition, failure of communication, increasing parental alienation by a custodial parent, and inability to cooperate can all constitute a material change in circumstances sufficient to warrant modification of custody. *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751. Further, we have held that the combined, cumulative effect of particular facts may together constitute a material change. *Graf, supra*; *Shannon v. McJunkins*, 2010 Ark. App. 440, 376 S.W.3d 489.

### A. Material Change in Circumstances

In her first point on appeal, Candace argues that the evidence failed to demonstrate that a material change in circumstances had occurred. Of the multiple factual findings supporting the court's determination that a material change in circumstances occurred, she challenges only three. She asserts that the court erred in finding a material change in circumstances based on her relationship with MC, John's relocation to Garland County, and MC's involvement in athletics. We therefore examine the relevant testimony on each of these subjects, as well as the circuit court's reasoning.

### 1. *Relationship between Candace and MC*

John was the first witness to testify at the hearing. He said that he and Candace do not get along and cannot talk about anything without it turning into a fight, so they just try not to talk as much as possible. The situation between them was beginning to affect MC, who was "pretty stressed out over it." He said that she would sometimes come home from

6

visitation with her mother and break down and cry. He felt that Candace was discussing too much of the custody situation with MC, adding that Candace did not deny doing so.

MC testified at the hearing as well. She said she was living half the time with her mom and half the time with her dad, but it was not going too well and was "difficult to live like that." She said that with her mom, "it's a little crazy. With my dad, it's kind of normal." MC did not feel comfortable talking to her mother about things that bothered her because her mom would not accept it or would just make another excuse.

On cross-examination, MC said that her mother had taken her to counseling, but she (MC) had made it clear that she did not want to go because it didn't help. Her mother also encouraged her to keep a journal, but she was not comfortable doing so "[b]ecause either way she's still going to be like, [MC]! And there's no point." She said that if her mother was mad on any given day, she could "get in possibly trouble for anything." She denied that her relationship with her mother had improved since she had started counseling, adding that her mother stayed in the room when she was speaking to the counselor, which made it hard to say what she felt. When she was asked if she thought the counseling was intended to improve her relationship with her mother, she said, "Honestly, I thought it might be the other way around because I thought she might be getting a counselor to see what I said and then report back to her."

For her part, Candace testified that she loves her daughter: "We have a great time. We play a lot of cards together. We go shopping. We do plan trips together. We like to travel when we can. We do work on our relationship. We do attend family counseling. And we

7

work on our relationship too, so that we can communicate better with each other and for me to understand where she's coming from because she does live in two households." Candace explained that she put MC in counseling because she had said some things that Candace found disturbing, like "that [she] was the fault for [the] divorce, that [she] was cheating on [John] with [her] current husband." She also accused MC of having a habit of lying, describing a few incidents that had occurred around 2021. She added that there had been times when MC had told her one thing and told John something different, which caused a strain in their relationship.

On cross-examination, Candace acknowledged that the incidents in which MC had lied had happened over three years previously, and she has grown up a little bit since then. She also agreed that she had put MC in counseling without telling John, saying that she did so because "it was family counseling, it was something for a relationship for me and my daughter."

In its order, the circuit court made lengthy and detailed findings regarding the deterioration of the relationship between Candace and MC:

> 13. [T]he relationship between [MC] and [Candace] has become very strained, to the point [Candace] sought joint counseling with [MC] with a counselor. The Court does not believe that counseling has changed the direction of their relationship at the present time. What is troubling about the counseling decision, in addition to the fact that it has become necessary, is that [Candace] did not notify [John], who has joint legal custody and who has final medical decision-making authority, of the counseling decision. When [John] asked [Candace] about the counseling when he later learned about it, she refused to give him any information and basically told him it was none of his business. This is not how individuals communicate and co-parent in these situations.

14. When [MC] testified, she stated that the joint custody relationship was not going well. When asked why, she indicated that her mom's house was "crazy" and her dad's house was "normal." She stated at her dad's house she has comfort, support, and there are no favorites. She does not feel the same way about her mother's home.

15. [MC] also testified that counseling was not improving their relationship. She felt inhibited in counseling because much of the time her mother was in the room when she was talking to the counselor and she could not open up to better discuss issues with the counselor for that reason. She also testified that she has difficulty talking to her mom about issues.

16. While [Candace], after [MC] testified, attempted to portray her as a liar, the evidence presented to substantiate this claim was roughly three years ago when [MC] was younger and less mature. Prior to her testimony the Court questioned her about her understanding of the difference between the truth and a lie and the consequences for telling a lie. After this discussion she was administered the oath. She acknowledged having problems telling the truth in the past but testified she had matured since then and understood there are consequences for telling a lie. In the Court's observations, while some of [MC]'s testimony may have been exaggerated, mainly concerning the amount of work she has to do to clean [Candace's] home by herself, her testimony appeared genuine and truthful. She cried and was visibly distraught during some of her testimony, in particular when she testified about her mother and their relationship. Those tears did not appear to be tears from anything other than being distraught over the subject matter of her testimony. While [MC] is 12, she appeared to by older and more mature than a 12-year-old. She appeared to be at least 14 to 15 in how she spoke, how she articulated her answers, and how she conducted herself in the courtroom.

17. The Court is of the firm opinion that one of the most "material" of the material changes which has occurred in this case is the strained relationship between [MC] and [Candace]. Those issues are real and do not appear to be fabricated by [MC] even though it appeared [Candace] wanted to downplay them.

On appeal, Candace argues that the circuit court misinterpreted the evidence, asserting that the strain between her and MC is "situational and nothing new" and complaining that the court focused on "isolated and occasional incidents." She contends that the circuit court erred in accepting MC's testimony that counseling was not helping

because "the patient is not the judge of what is helping her; rather, the medical professional is, yet [John] called none, and the court cited no evidence." She further argues that it is no surprise that MC wants to live with her father who "let[s] her do anything" rather than her mother who makes her do chores.

We find that Candace's arguments amount to little more than a request for this court to weigh the evidence differently than the circuit court did. It is, of course, well settled that we do not do this. *Bay v. Fajriati*, 2025 Ark. App. 226, 712 S.W.3d 388; *Cline v. Simpson*, 2024 Ark. App. 611, 703 S.W.3d 497. We find no error in the circuit court's analysis of the deteriorating relationship between Candace and MC as a factor in concluding that there had been a material change in circumstances.

2. *John's relocation to Garland County and MC's involvement in athletics*[1]

This case was initially filed in Garland County; at that time, John lived in Hot Springs, and Candace lived in Malvern. At some point during the proceedings (the exact date is not clear in the record), John moved to Clark County, and Candace moved to Saline County. The case was transferred to Saline County in July 2017. By the time of the final hearing, John had moved back to Hot Springs, and Candace lived in Benton.

At the hearing, John testified that MC was currently enrolled in the Benton School District; when he and his wife had MC, they drove her back and forth to Benton for school.

---

[1]Although Candace presents these issues as two separate subpoints on appeal, the circuit court's findings regarding John's relocation and MC's activities were addressed together in the order modifying custody. We therefore treat them together as well.

If custody were changed, she would be enrolled in the Mountain Pine School District. He explained that it is hard for MC to "join sports and stuff" with the current custodial arrangement. He said that MC wants to play volleyball and basketball, which she could do at Mountain Pine, but Candace told her she could not play those sports. He added that it is "extremely difficult" for MC to engage in extracurricular activities because of the distance between Saline and Garland Counties.

MC also described the difficulty in engaging in extracurricular activities caused by splitting her time between Garland and Saline Counties. She said she could only play sports in Saline County. She wants to play basketball, but practices take place more than once a week: "It's like you got to go there every day to play it, and I can't do that with my dad. And then my mom said no, so I can't do that."

The circuit court made the following findings regarding John's relocation and MC's activities:

> [W]hile both parties have relocated to different counties since this case was initially filed, [John] has relocated back to Garland County. While that in and of itself is not necessarily a material change since 2020, other facts and circumstances contribute to [MC]'s father's residing in Garland County as being a factor in the material change of circumstances equation. After the passage of time from 2020 to the current time period, [MC] is several years older, further along in school, and desires to be more involved in educational, church, and extracurricular activities than she was when she was younger. The distance between where [John] lives in Garland County, where [Candace] lives in Saline County, and where [MC] attends school in Saline County has hampered [MC]'s ability to fully enjoy her childhood and participate fully in these activities. Certainly, having to travel to and from Hot Springs to Benton on a daily basis to attend school and other activities, every other week, has to be a difficult proposition for any family and a soon-to-be teenager. The Court is of the opinion that the passage of time coupled with the distance each of the parties live from each other

11

in relation to [MC]'s school, in particular, has created a material change in circumstances.

Citing cases such as *Jowers v. Jowers*, 92 Ark. App. 374, 214 S.W.3d 294 (2005), and *Hollandsworth v. Knyzewski*, 353 Ark. 470, 109 S.W.3d 653 (2003),[2] Candace argues that relocation alone is not in and of itself a material change in circumstances, especially for the relocating party. She argues that John's "move and attempted justification for relocation are not sufficient in this case to constitute a material change to [modify] custody." The circuit court, however, did not consider John's move to Garland County in isolation. John's relocation was simply a factor in the court's overall consideration of whether there had been a material change in circumstances, which is entirely appropriate. *See McCoy, supra* (noting that one parent's relocation is an appropriate factor to consider when determining if there has been a material change in circumstances).

Candace also asserts that the circuit court erred in concluding that the limitations on MC's ability to participate in sports was a factor warranting a modification of custody. She asserts that MC's testimony on this subject was, "if anything[,] misguided or pretextual. Yet the trial court accepted this argument as a material change of [circumstances]." To the extent that this is an argument that the court erred in crediting MC's testimony, it is axiomatic that we defer to the circuit court's assessment of the credibility of witnesses, especially in cases

---

[2]In *Singletary v. Singletary*, 2013 Ark. 506, 431 S.W.3d 234, the supreme court clarified that *Hollandsworth*'s presumption in favor of relocation on the part of the custodial parent does not apply when the parents share joint custody of the children.

12

involving the custody of children. *See, e.g., Coleman v. Coleman*, 2025 Ark. App. 550; *Burns v. Dillinger*, 2025 Ark. App. 543, 726 S.W.3d 596.

## B. Division of Custodial Time

In its order modifying custody, the circuit court stated that it was "maintaining the joint legal custody relationship; however, physical custody shall be with [John]" subject to Candace's "custodial times" every other weekend.[3] The court also modified Candace's and John's parental responsibilities, establishing John as the primary decision maker for both medical and educational decisions in the event the parties could not reach an agreement on major life decisions.

In her second argument on appeal, Candace argues that "the trial court erred in modifying 'joint custody' since giving primary residence to [John], with unequal time to [Candace] and principal decision-making authority to [John], failed to satisfy joint custody." Here, she argues that there is a presumption favoring joint custody, and John failed to rebut it. In addition, she asserts that the circuit court "continued what it termed 'joint custody,' but in fact, it was not." Noting that the court awarded physical custody to John and visitation to Candace every other weekend, she maintains that this was "far from nearly equal time to the extent possible in a case of joint custody."

---

[3]We note that in his counterclaim in response to Candace's motion for modification of custody, John specifically asked the court to place custody with him "with visitation to [Candace]" and did not seek the retention of the "joint custody" label. He does not, however, cross-appeal from the court's decision to "maintain[ ] the joint legal custody relationship," and we therefore do not address it.

We first note that the presumption in favor of joint custody applies only to the initial custody determination. *See* Ark. Code Ann.§ 9-13-101(1)(1)(A)(iv)*(a)* (Supp. 2025) ("In an action concerning *an original child custody determination in a divorce* or paternity action, there is a rebuttable presumption that joint custody is in the best interest of the child.") (emphasis added); *Saunders v. Saunders*, 2022 Ark. App. 428, at 12 n.4, 653 S.W.3d 830, 838 n.4 (noting that the presumption in favor of joint custody did not apply in an appeal from a custody-modification order because it was "not an original child-custody determination").

Moreover, to the extent Candace argues that the court erred in entering a "lopsided" award of physical custody, she cites no authority supporting the notion that it is impermissible for a court to award joint legal custody while giving one parent primary physical custody.[4] Indeed, this court has affirmed a circuit court's decision in a divorce case to award the parents joint legal custody of both children while granting primary physical custody of one child to the mother and primary physical custody of the other child to the father. *Jackson v. Littleton*, 2018 Ark. App. 511, 561 S.WS.3d 352; *see also Hortelano v. Hortelano*, 2017 Ark. App. 98, 513 S.W.3d 890 (affirming an award of joint custody to both parents with mother being the primary custodial parent). Accordingly, we find no error in

---

[4]Candace cites *Nalley v. Adams* for the proposition that "[j]oint custody means the approximate and reasonable equal division of time with the child by both parents individually as agreed to by the parents or as ordered by the court." 2021 Ark. 191, at 6 n.1, 632 S.W.3d 297, 301 n.1. As the supreme court recognized in *Cooper v. Kalkwarf*, however, "joint custody arrangements cannot be defined with mathematical precision." 2017 Ark. 331, at 15, 532 S.W.3d 58, 67 (emphasizing the phrase "*approximate and reasonable equal division of time*" in Arkansas Code Annotated section 9-13-101(a)(5)).

the circuit court's decision to maintain joint legal custody between Candace and John while giving primary physical custody to John.[5]

## C. Best Interest

In her final point on appeal, Candace argues that the circuit court erred in finding that modification of the parties' custody arrangement was in MC's best interest. The circuit court found that the modification was in MC's best interest "based on the same analysis the Court utilized in finding a material change [of circumstances] to exist in this case, including specifically the comfort and support MC finds in [John's] home, as well as her stated preference to live with [her father]."

On appeal, Candace asserts that she "is an example of an exemplary parent who has done all possible and should be allowed to continue in joint custody as it is understood in Arkansas law. . . . To conclude otherwise is based on speculation or conjecture that MC will be better served by living essentially in one household but for every other week of visitation." Again, however, Candace's argument is little more than a request for this court to reweigh the evidence in her favor, which we cannot do. *Wadley v. Wadley*, 2019 Ark. App. 549, 590

---

[5]We acknowledge that decisions such as the circuit court's findings here--retaining the title of "joint custody" while markedly altering custodial time--can create the appearance of a contradiction. We therefore repeat our supreme court's caution in *Heileman v. Cahoon* that "[w]hen circuit courts are adjusting parenting time, they should be cognizant of the terminology they use and pay attention to whether an adjustment in schedule might turn into a de facto change in custody." 2024 Ark. 164, at 9, 699 S.W.3d 85, 90; *see also Stewart v. Stewart*, 2025 Ark. App. 97, at 12 (recognizing potential conflict between an arrangement labeled "joint custody" that also provided that one parent should have primary physical custody).

S.W.3d 754. The circuit court specifically found Candace's testimony less than credible and noted that she "wanted to downplay" MC's concerns. The circuit court was in a much better position than this court to observe the parties and assess their credibility. *See, e.g.*, *McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91. Giving great weight to the court's observations as we must, we cannot say that the circuit court clearly erred in finding that it was in MC's best interest to modify the parties' custody arrangement. We therefore affirm.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Robert S. Tschiemer*, for appellant.

*Baxter Law Firm, PLLC*, by: *Bobby McCallister*, for appellee.